MARGARET M. WEST, CLIFFORD SCOTT, CALEB POYNER, ELWYN WALKER, JAMES O. DUNTON, DONALD ADAMS, SAMUEL H. LAMB, SAMUEL H. LAMB, II, PAMELA V. WEILAND v. EARL F. SLICK AND WIFE, JANE P. SLICK, PINE ISLAND DEVELOPMENT VENTURE, RDC, INC.

No. 111PA83

(Filed 27 February 1985)

1. **Easements § 6.1; Highways and Cartways § 11.2— neighborhood public roads —easements by prescription—evidence of routes of use sufficient**

   In an action to restrain the blocking of public access and to create an easement or public roadway over unpaved and unimproved roads that cross respondents' Outer Banks property, the Court of Appeals erred by holding that the evidence failed as a matter of law to identify specific and definite routes of use where the testimony was to the effect that since the early 1900's the Inside Road has been a recognized road with a definite and specific course and variation only in the route taken by some travelers, not in the road itself, and that deviation in the Pole Line Road was not substantial. G.S. 136-67, G.S. 1A-1, Rule 50.

2. **Easements § 6.1; Highways and Cartways § 11.2— neighborhood public roads —necessary means of ingress and egress—evidence insufficient**

   Where petitioners contended that two roads across respondents' Outer Banks property were "neighborhood public roads" under G.S. 136-67, but the State Board of Transportation adopted a resolution providing for the acquisition of a right of way in a third road in the area, the two roads in question were no longer the "necessary" means of ingress and egress from petitioners' dwelling houses.

West v. Slick

3. **Easements § 6.1; Highways and Cartways § 11.2— neighborhood public roads —outside city limits, public use—evidence sufficient**

In an action to create a public roadway over unpaved and unimproved roads across respondents' Outer Banks property, the evidence was sufficient to take the case to the jury upon the theory of neighborhood public roads under the third part of G.S. 136-67 where the evidence of the location, nature and use of the roads in question was adequate to permit a jury to find that either one or both of the roads were located outside the boundaries of any incorporated city or town, that they served a public use and that they served as a means of ingress and egress for one or more of petitioners' families.

4. **Easements § 6.1; Highways and Cartways § 11.2— public roads—easement by prescription—evidence sufficient**

In an action in which petitioners contended that two unpaved roads across respondents' Outer Banks property had become public roads through prescription based on continuous and open public use for over twenty years, there was abundant evidence that the public had used the two roadways openly, notoriously and continuously for decades, that no permission was obtained or sought, and that these roads were the primary means of access by land to Corolla and the Currituck Banks. Assuming *arguendo* that a requirement of public maintenance is applicable, there was sufficient evidence of public maintenance to take the case to the jury.

5. **State § 2.1; Waters and Watercourses § 7— use of foreshore by public to be unobstructed**

Where the testimony in an action to establish public roadways through respondents' Outer Banks property showed that members of the public regularly used the foreshore area but did not show whether respondents were denying access across their land to the foreshore, the rule that passage by the public by foot, vehicle and boat must be free and substantially unobstructed over the entire width of the foreshore was affirmed.

6. **Appeal and Error § 26— failure to make assignments of error or to group exceptions—appeal itself is exception to judgment**

Where petitioners excepted in apt time to the granting of a directed verdict, the appeal itself was an exception to the judgment, and the Court of Appeals correctly ruled that the petitioners satisfied the requirements of Rule 10 of the Rules of Appellate Procedure even though petitioners failed to make assignments of error or to group exceptions.

Justices MITCHELL and VAUGHN did not participate in the consideration or decision of this case.

ON discretionary review of a decision of the Court of Appeals, reported at 60 N.C. App. 345, 299 S.E. 2d 657 (1983), which affirmed the judgment of *Ervin, J.,* entered 30 September 1976 in Superior Court, PASQUOTANK County, allowing respondents' motion for directed verdict at the close of petitioners' evidence and

dismissing the action. The Court of Appeals denied petitioners' Motion to Rehear by Order dated 17 February 1983. This Court allowed petitioners' Petition for Discretionary Review on 9 September 1983.

This case arose in September 1975 with the filing by petitioners of a special proceeding before the Clerk of Superior Court, Currituck County, in which petitioners sought to restrain respondents from blocking public access by vehicle to Corolla from the south across respondents' land and to establish two specific and definite "roads" across such land as neighborhood public roads pursuant to N.C.G.S. § 136-67 and as public roads by prescription or by dedication. The case was transferred from Currituck County to Pasquotank County and subsequently came on for hearing before Judge Sam J. Ervin III and a jury duly empaneled at the 27 September 1976 regular Civil Session of Superior Court, Pasquotank County. At the conclusion of the petitioners' evidence, Judge Ervin allowed respondents' motion for a directed verdict made pusuant to Rule 50 of the North Carolina Rules of Civil Procedure and dismissed the action. The judgment also continued in effect, pending final determination of the appeal in this case, permission theretofore granted by respondents to petitioners with respect to the use of a new, paved road through respondents' property known as the Coastland Road and unrelated to either of the two roads which are the subject of this action.

Petitioners appealed and after the case was briefed in the Court of Appeals (Formerly No. 771SC147), the parties moved that the action be stayed pending proceedings before the North Carolina Department of Transportation concerning overall public access on the entire Currituck County section of the Outer Banks. Despite the passage of approximately five years during which there were lengthy proceedings before the Department of Transportation, the matters relating to public vehicular access between the Dare-Currituck County line and Corolla were not resolved. The parties ultimately requested that the Court of Appeals hear the appeal in the fall of 1982. The appeal was heard on 6 December 1982 and the Court of Appeals affirmed the trial court's grant of a directed verdict for the respondents.

We allowed discretionary review on the grounds that the subject matter of this case is of significant public interest because

it involves the question of whether the public has access by un-paved road to the Village of Corolla and that it involves legal principles of major significance to the jurisprudence of this State, to wit: the standard of proof required to prove the existence of a public road in the shifting sands of the Outer Banks by "specific and definite lines or routes of use."

*Sanford, Adams, McCullough & Beard, by J. Allen Adams, Charles C. Meeker and Steven J. Levitas, for petitioner appellants.*

*Womble, Carlyle, Sandridge & Rice, by W. F. Womble, Allan R. Gitter and William McBlief; Leroy, Wells, Shaw, Hornthal, Riley & Shearin, by Dewey W. Wells, for defendant appellees.*

MEYER, Justice.

The primary issue presented on this appeal is whether the petitioners' evidence was sufficient to take the case to the jury. We find that it was and for the reasons stated herein we reverse the decision of the Court of Appeals and remand the case to the trial division for trial on the merits.

The area of North Carolina known and usually referred to as "the Outer Banks" consists of narrow windswept islands and spits of land guarding our coastal sounds and waters and is character-ized by its remoteness, its sparsity of population, its frequent bat-tering by high winds and high seas and the accompanying shifting sands, erosion and accretion. The area offers over three hundred miles of ocean beaches stretching from Corolla near the Virginia border to Sunset Beach on the South Carolina border. Scattered on these barrier islands are villages and communities of unique qualities with picturesque names such as Duck, Kitty Hawk, Kill Devil Hills, Nags Head, Whalebone, Waves, Salvo, Salter Path, In-dian Beach, Topsail, and Sunset. This unique area is not only home to a hardy people, it beckons to the vacationer, the natu-ralist, the sightseer, the sailor, the fisherman and the hunter alike. These lands are, at the same time, sturdy guardians of our mainland against fierce winds and seas and fragile coastal ecosys-tems.

Respondents are individuals and joint ventures owning a tract of land known as the "Pine Island property" approximately four miles long and from three hundred yards to three-quarters of

a mile wide running between the Atlantic Ocean on the east and Currituck Sound on the west and lying between Corolla to the north and the Currituck-Dare County line to the south.[1] The northern property line of the tract is approximately seven miles south of Corolla while the southern property line is located near the Currituck-Dare County line. The tract actually extends into Dare County a short distance but the allegations in the pleadings refer only to the tract bounded on the south by the Currituck-Dare County line.

Petitioners are nine individuals, some of whom are owners of real property on the Outer Banks of Currituck County. Some of the petitioners are residents of Corolla, some of Knotts Island, and some are residents of other areas of Currituck County north of respondents' property. Yet others are nonresidents of North Carolina.

The property in question consists of sand beach, dunes and marsh, and comprises about four of the eleven miles of the Outer Banks between the Currituck-Dare County line and the Village of Corolla. The property has always been and largely still is wild, open land.

Pursuant to a private easement respondents permit certain individuals to cross their property on a new paved road. Respond-

---

1. During the times pertinent to this case the Pine Island property was owned by:

Earl F. Slick by deed dated 29 November 1972, Book 116, page 220 and Pine Island Development Venture, deed dated November 29, 1973, Book 124, page 216, are present owners. Pine Island, Inc. from January 15, 1958 to January 11, 1972. Austin O. Barney and wife from January 21, 1936 to January 15, 1958.

(Since 1936 the property in question has been a single tract; prior to 1936 the property in question was in two separate tracts—the Northern Tract and the Southern Tract:)

Northern Tract: Preston Clark and Arthur Milliken, Trustees of Pine Island Trust, from April 14, 1911 to January 21, 1936. Julian Baum et al. from May 28, 1910 to April 14, 1911. Prior to 1910 by Dr. Josephus Baum, his brother Jacob, and their father and other members of the Baum family.

Southern Tract: Preston Clark and Arthur Millikin, Trustees, from June 3, 1919 to January 21, 1936. William P. Clyde from May 18, 1914 to June 3, 1919; Clarence Gallop and his father from the latter part of the nineteenth century to 1914.

ents however have, by the use of chain link gates, a guardhouse and conspicuous signs, prohibited vehicular traffic by the general public, including petitioners, from crossing the Pine Island property. Because vehicular access to Corolla from the north is blocked by the Back Bay National Wildlife Refuge and from the east and west by the Atlantic Ocean and Currituck Sound respectively, respondents in effect are denying the petitioners and the public the only available vehicular access to and from Corolla and the northern reaches of the Currituck outer banks. The respondents have denied access contending that the ways and easements across their property are private.

N.C.G.S. § 136-67 provides, in pertinent part, as follows:

Neighborhood public roads.—All those portions of the public road system of the State which have not been taken over and placed under maintenance or which have been abandoned by the Department of Transportation, but which remain open and in general use as a necessary means of ingress to and egress from the dwelling house of one or more families, and all those roads that have been laid out, constructed, or reconstructed with unemployment relief funds under the supervision of the Department of Human Resources, and all other roads or streets or portions of roads or streets whatsoever outside of the boundaries of any incorporated city or town in the State which serve a public use and as a means of ingress or egress for one or more families, regardless of whether the same have ever been a portion of any State or county road system, are hereby declared to be neighborhood public roads and they shall be subject to all of the provisions of G.S. 136-68, 136-69 and 136-70 with respect to the alteration, extension, or discontinuance thereof, . . . . Provided, that this definition of neighborhood public roads shall not be construed to embrace any street, road or driveway that serves an essentially private use, and all those portions and segments of old roads, formerly a part of the public road system, which have not been taken over and placed under maintenance and which have been abandoned by the Department of Transportation and which do not serve as a necessary means of ingress to and egress from an occupied dwelling house are hereby specifically excluded from the definition of neighborhood public roads, and the owner of the

land, burdened with such portions and segments of such old roads, is hereby invested with the easement or right-of-way for such old roads heretofore existing. Upon request of the board of county commissioners of any county, the Department of Transportation is permitted, but is not required, to place such neighborhood public roads as above defined in a passable condition without incorporating the same into the State or county system, and without becoming obligated in any manner for the permanent maintenance thereof.

This statute declares three distinct types of roads to be neighborhood public roads. The first part of the statute concerns only those roads which were once a part of the "public road system." The second part of the statute declares to be neighborhood public roads all those roads that had been laid out, constructed, or reconstructed with unemployment relief funds under the supervision of the Department of Public Welfare. The third part of the statute declares to be neighborhood public roads all those roads outside the boundaries of municipal corporations which served a public use and as a means of ingress and egress for one or more families. *See Walton v. Meir*, 14 N.C. App. 183, 188 S.E. 2d 56, *cert. denied*, 281 N.C. 515, 189 S.E. 2d 35 (1972).

By this proceeding the petitioners sought to establish the existence of two roads for use by the public across respondents' lands by one or more of the following theories: (1) a "neighborhood public road" under the first part of N.C.G.S. § 136-67 relating to roads which were once a part of the public road system, (2) a "neighborhood public road" under the third part of N.C.G.S. § 136-67 concerning roads located outside city limits which serve a public use, (3) a "*public* road" (as opposed to a "*neighborhood public* road") through prescription based upon continuous and open public use for over twenty years, and (4) a "public road" by implicit or explicit dedication.

The Court of Appeals did not reach the question of whether petitioners' evidence concerning any one or more of the four theories was sufficient for submission to the jury. That court held that as a preliminary matter, petitioners' evidence failed to establish the *identity or situs* of either roadway claimed — that is, the evidence failed, as a matter of law "to disclose that travel was confined to a definite and specific line," *citing Speight v. Ander-*

*son,* 226 N.C. 492, 39 S.E. 2d 371 (1946) and *Cahoon v. Roughton,* 215 N.C. 116, 1 S.E. 2d 362 (1939).

Upon review, this Court must determine: (I) whether the Court of Appeals erred in its holding that the evidence failed as a matter of law to identify specific and definite routes of use, and (II) if the Court of Appeals erred in that regard, whether there was sufficient evidence to take the case to the jury on one or more of the theories propounded by the petitioners and brought forward on appeal.

I.

At the close of the petitioners' evidence the respondents made a motion for a directed verdict and the trial judge allowed the motion and entered judgment dismissing the action. We conclude that, upon the evidence presented by the petitioners, the trial court erred in so directing the verdict and dismissing the action.

In a jury trial, the motion for a directed verdict is the only procedure by which a party may test the sufficiency of his adversary's evidence to go to the jury. *Creasman v. Savings & Loan Assoc.,* 279 N.C. 361, 183 S.E. 2d 115 (1971), *cert. denied,* 405 U.S. 977, 31 L.Ed. 2d 252 (1972).

Upon a motion for a directed verdict pursuant to N.C.G.S. 1A-1, Rule 50, the court must view the evidence in the light most favorable to the nonmovant, resolving all conflicts in his favor and giving him the benefit of every inference that could reasonably be drawn from the evidence in his favor. *Norman v. Banasik,* 304 N.C. 341, 283 S.E. 2d 489 (1981); *Manganello v. Permastone, Inc.,* 291 N.C. 666, 231 S.E. 2d 678 (1977). It is only where the evidence, when so considered, is insufficient to support a verdict in the nonmovant's favor that the motion for directed verdict should be granted. *Snow v. Power Co.,* 297 N.C. 591, 256 S.E. 2d 227 (1979).

A directed verdict is proper only if it appears that the nonmovant failed to show a right to recover upon *any* view of the facts which the evidence reasonably tends to establish. *Manganello v. Permastone, Inc.,* 291 N.C. 666, 231 S.E. 2d 678. Or, as otherwise expressed—" 'On a motion by a defendant for a directed verdict in a jury case, the court must consider all the evidence in the light most favorable to the plaintiff and may

grant the motion for a directed verdict only if, *as a matter of law*, the evidence is insufficient to justify a verdict for the plaintiff.' 5 Moore's Federal Practice, § 41.13(4) at 1155 (2d ed. 1969)." *Kelly v. Harvester Co.*, 278 N.C. 153, 158, 179 S.E. 2d 396, 398 (1971).

[1]  As the Court of Appeals correctly noted, it is well-settled that in order to create an easement or public roadway, the evidence must disclose that travel was confined to a definite and specific line. *Speight v. Anderson*, 226 N.C. 492, 39 S.E. 2d 371; *Cahoon v. Roughton*, 215 N.C. 116, 1 S.E. 2d 362. Furthermore, although there may be slight deviations in the line of travel, there must be substantial identity of the easement claimed. *Speight v. Anderson*, 226 N.C. 492, 39 S.E. 2d 371; *Taylor v. Brigman*, 52 N.C. App. 536, 279 S.E. 2d 82 (1981). While the evidence submitted by the petitioners might have been conflicting in certain respects, upon motion for directed verdict, the trial judge, and indeed the appellate courts on review, must view the evidence in the light most favorable to the petitioners and give them the benefit of every inference that could reasonably be drawn. We now proceed to review the petitioners' evidence in that light to determine whether it sufficiently established the threshold fact that travel was confined to a definite and specific line to take the case to the jury as to either or both roads.

Two unpaved and unimproved roads cross respondents' Pine Island property. One is known as the "Inside Road" or as the "Soundside Road" and the other as the "Pole Line Road." The two names for the first mentioned road, "Inside Road" and "Soundside Road" are used interchangeably and the road is so named because it lies along the sound side or inside (western side) of the Currituck Outer Banks. This road was well known to and used by the many witnesses who testified, most of whom were local residents of Currituck and Dare Counties. This road was used since the early 1900's as the main route from Kitty Hawk, through Duck to Caffey's Inlet and then through what is now the respondents' property to Poyner's Hill and on along the inside of the banks to the Village of Corolla.

The testimony of the witnesses reveals that the Inside Road was used by them from as early as 1912 through 1974, and there was substantial evidence that for much of this century the Inside Road has been in good, passable condition. There was also evi-

dence that, in addition to this principal route, travelers going north above Poyner's Hill (which is approximately one-half mile south of respondents' northern property line), if the tide was out and the sea calm, also frequently drove along the surf to Corolla. Some of those who used the surf route would cut over from the Inside Road at Poyner's Hill while others would veer over to the Pole Line Road to reach Poyner's Hill and then cut over to the beach. Weather permitting, vehicles have been and are able to negotiate the beach relatively easily from Poyner's Hill to Corolla. However, apparently because of its pebbles and soft sand, the beach through the entire length of the Pine Island property and north to Poyner's Hill is virtually impassable by vehicle and has never been regularly used. While there was evidence that the routes of the travelers varied, no witness indicated any uncertainty about the course of the Inside Road and there was no testimony that the course of the Inside Road ever shifted, deviated or was ever obscured. On petitioners' Exhibit No. 10, a 1970 aerial photo, this road clearly appears, particularly as it crosses respondents' Pine Island property.

A few examples of the nature of the testimony regarding the variation of the course of the *Inside Road* are instructive:

Mrs. Margaret Dowdy, a long-time resident of the general area, testified that she had traveled the Inside Road and the Pole Line Road since 1912. In describing the Inside Road, she said, "You did not go in one track as opposed to another track. There was one deep track, and if you met anybody it was just too bad. There was no brush that had grown up in the track . . . anybody that lives on the beach knows the sand moves when it blows. I would say there was not much variation when sand blew in any of the tracks."

Mr. Leslie James Henley, who was 72 years old and lived in Corolla, testified that he had driven the Inside Road "many a time" and that he had driven on the Inside Road past Dr. Baum's club a "million times in cars." He testified on cross-examination that the "old road that we used to drive (the Inside Road) did not change depending upon the conditions of the winds and rain and the tides."

Mr. Caleb Poyner, a lifelong resident of Currituck County and one of the petitioners, testified that the Inside Road and the

Pole Line Road "were definite routes." With specific reference to the Inside Road he said, "Referring to Exhibit No. 10 (the strip aerial photograph), there is a main track for the Inside Road which over the years has been consistently followed."

Mr. David H. Lawrence, a resident of Currituck and Dare Counties for nearly 50 years, testified that he traveled both the Inside and Pole Line Roads as early as 1927. Referring specifically to the Inside Road he testified, "That road was there in 1927 when I made my trip. I would say that the road as shown on this 1970 map varies almost negligible [sic] with the same road that was there in 1927."

In sum, the testimony of the witnesses was to the effect that since the early 1900's the Inside Road has been a recognized road with a definite and specific course. The only evidence of variation relevant to the Inside Road was not in the road itself but in the route taken by some of the travelers northward from Dr. Baum's club, which did vary depending on the weather, the seas and the tides. The fact that the travelers often took the Inside Road all the way to Corolla but at other times went by a different route, does not mean that the Inside Road was less than a definite and specific line.

The second road, known as the "Pole Line Road" because of its location along established telephone line poles, is located behind the sand dune line. In former days, a telephone line ran from Oregon Inlet to Virginia Beach and Coast Guard Stations located at intervals of approximately six miles were connected by this line. The Pole Line Road through respondents' property was apparently the maintenance road located on the west side of the line of telephone poles. The evidence seems to indicate that electric lines were also located on these poles and the road is sometimes referred to by the witnesses as the Power Line Road. Like the Inside Road, the Pole Line Road can be easily discerned on the aerial photograph which is petitioners' Exhibit No. 10, particularly as it traverses respondents' Pine Island property. The Pole Line Road is a sand road or trail and there was evidence that its course *has* deviated slightly through the years. Numerous witnesses testified as to the existence, location and course of the Pole Line Road. Notably, witnesses Caleb Poyner and David Law-

rence identified the road on the strip aerial photo admitted into evidence as petitioners' Exhibit No. 10.

As to the deviation in the course of the *Pole Line Road*, the evidence taken in the light most favorable to the petitioners indicates that the deviation was slight.

Mr. Blanton Saunders, a long-time resident of the area who at one time worked for about six years for one of respondents' predecessors in title, testified that he had traveled the Pole Line Road many years since 1926. While there was evidence to the contrary from another witness, Mr. Blanton Saunders described the Pole Line Road as being on the west side of the telephone line poles at all times. Saunders testified that though there were deviations when cars had to pass each other, the main tracks were always on the west side of the poles and the line of poles was as "straight as a compass would put it." He described the road as being 18 to 20 feet along the line of poles. Although the blowing sand sometimes filled the tracks, the roadway was always discernible.

Mr. Elwyn Walker, another of the petitioners and a resident of the Currituck area, began traveling the area in the late 1960's and testified: "During the time I was traveling the Pole Line Road, there was more or less one main track. There were places along that you would have to get away from the main road, but it wasn't too far either way. The deviations from the track were probably just bad places where you would go around, or where somebody had passed somebody and got out of the tracks. Most of the time, when I would go back, the main track would be back there and you would follow it and not the deviation."

Mr. James Dunton, a petitioner who is a resident of Coinjock but owns property north of Corolla, testified in part that he first traveled the area about 1950 and that when he was "picking my way" along the Pole Line Road past the Pine Island "Club," "I would stray out of the normal regular tracks maybe to let a car by, or where one had passed before. I never had a problem where [sic] the road got bad because [of] wind or rain."

As we have with regard to the Inside Road, we find that petitioners' evidence with regard to the Pole Line Road meets the test of substantial identity. Although there was evidence of some

slight deviation, at least so far as the Pole Line Road is concerned, that deviation was not substantial. Thus, we conclude that although there was substantial evidence that travelers passing through respondents' property varied their chosen routes, there was also sufficient evidence of the substantial identity of the easements claimed for both the Inside Road and the Pole Line Road to take the case to the jury as to both roads. Accordingly, we hold that the Court of Appeals erred in holding that the petitioners' evidence "failed as a matter of law to identify specific and definite lines or routes of use."

## II.

Having determined that the Court of Appeals erred in holding that the evidence failed to disclose that travel was confined to a definite and specific line, we now move to the question of whether the evidence was otherwise sufficient to take the issues to the jury on the theories advanced by the petitioners. As petitioners have not brought forward for review any assignment of error or issue with regard to their theory number (4) (a public road by virtue of an implicit or explicit dedication), we will address only their theories numbers (1) and (2)—establishment of the roads in question as "neighborhood public roads" under the first and third parts of N.C.G.S. § 136-67 and (3)—their establishment by prescription. We do not discuss the so-called "public trust" theory as it was not pled and not addressed by the trial court nor was it briefed or argued on appeal.

[2] Petitioners' first theory is that the two roads in question are "neighborhood public roads" under the first part of N.C.G.S. § 136-67 relating to roads which were once a part of the public road system. However, events transpiring subsequent to filing of the record and briefs and the oral arguments on this appeal make it unnecessary for us to address this theory in any significant detail.

We take judicial notice of the fact that, at its regular meeting on 12 October 1984, the State Board of Transportation adopted a resolution which provided *inter alia* as follows:

WHEREAS, the General Assembly by Resolution 42 ratified on July 7, 1983, urged the Department of Transporta-

tion to provide public access to the community of Corolla on the Outer Banks in Currituck County; and

WHEREAS, the Currituck County Board of Commissioners by resolution adopted August 6, 1984, requested the Department of Transportation to provide a public road from the Currituck-Dare County line on the Outer Banks to the Village of Corolla; and

WHEREAS, the Department of Transportation and the Board of Transportation recognize the need for the road; and

\*   \*   \*

WHEREAS, the Board of Transportation finds that such rights of way to be acquired and hereinafter described are for public use and are necessary for the maintenance of the road connecting SR 1200 at the Currituck-Dare County line to existing SR 1185 at the Village of Corolla.

NOW, THEREFORE, IT IS HEREBY ORDAINED that the existing road from SR 1200 near the Currituck-Dare County line to Corolla, which road is more particularly described on Exhibit 1 attached hereto, is hereby added to the State Highway System effective November 1, 1984. Those portions of the road dedicated to the public which have been constructed, are hereby accepted. The Right-of-Way Branch is directed to immediately acquire by deed or right-of-way agreement the rights-of-way for portions of the existing road from SR 1200 to Corolla which are not dedicated to the public. The Attorney General's Office is requested to initiate proceedings to acquire by condemnation the right-of-way for those sections of road not dedicated to the public which the Right-of-Way Department has not acquired prior to November 1, 1984. The right-of-way to be acquired by conveyance or condemnation shall be 60 feet in width; except where the road is located on dedications which are not to the public, and as to such locations, the right-of-way to be so acquired shall be 100 feet in width to coincide with such dedications.

Minutes of the State Board of Transportation, 12 October 1984, Minute Book 16A, pp. 4347-50.

Attached to the resolution as Exhibit 1 is a general center-line description of the proposed right-of-way of the roadway to be acquired from the end of existing SR 1200 near the Currituck-Dare County line to Corolla, added to the State Highway System effective 1 November 1984. The centerline description runs for a distance of 10.87 miles, 3.61 miles of which traverse respondents' property. The description, as it crosses respondents' property, appears to follow the centerline of an existing paved private road. From the foregoing resolution it appears that the width of the right-of-way through respondents' property will be a minimum of sixty feet.

The first part of N.C.G.S. § 136-67 designates as neighborhood public roads: "All those portions of the public road system of the State which have not been taken over and placed under maintenance or which have been abandoned by the Department of Transportation, but which remain open and in general use *as a necessary means of ingress to and egress from the dwelling house of one or more families. . . .*" (Emphasis added.) It is abundantly clear that this first part of the statute relating to roads which were once a part of the public road system applies only to a road or roads which constitute a "necessary" access to a dwelling house.

The Department of Transportation having acquired the foregoing right-of-way for the construction of a public highway, neither of the two roads in question any longer constitutes a "necessary" means of ingress and egress from the dwelling houses of the petitioners across respondents' land—a means having been supplied by the acquisition of said right-of-way. *See Community Club v. Hoppers*, 43 N.C. App. 671, 260 S.E. 2d 94 (1979), *disc. rev. denied*, 299 N.C. 329, 265 S.E. 2d 403 (1980).

[3] Petitioners' second theory concerns the third part of N.C.G.S. § 136-67 relative to roads located outside city limits which serve a public use. That part of the statute provides: "[A]ll other roads or streets or portions of roads or streets whatsoever outside of the boundaries of any incorporated city or town in the State which serve a public use and *as a means of ingress and egress for one or more families*, regardless of whether the same have ever been a portion of any State or county road system, are

hereby declared to be neighborhood public roads. . . ." (Emphasis added.)

Although the legislature created and defined the first two types of neighborhood public roads in 1933, it was not until 1941 that the statute was rewritten to include this third type. N.C. Public Laws 1941, Chapter 183. *See Walton v. Meir*, 14 N.C. App. 183, 188 S.E. 2d 56. It is to be specifically noted that, unlike the first part of the statute, under this third part it is immaterial whether the road has ever been a part of the public road system and this part does not specify that the means of ingress and egress be a "necessary" means. Thus the recent acquisition of the right-of-way for the proposed road does not moot petitioners' theory that the roads are neighborhood public roads under the third part of the statute.

Under this third part of the statute, the elements required to be shown to establish a neighborhood public road are: (1) the road or street or portions thereof are outside the boundaries of any incorporated city or town, (2) serves a public use, and (3) serves as a means of ingress or egress, (4) for one or more families. We have held that this third part refers to traveled ways which were established easements or roads or streets in a legal sense at the time of the 1941 amendment. *Speight v. Anderson*, 226 N.C. 492, 39 S.E. 2d 371. "The term 'legal' means that which is according to law. It does not mean permitted by law, but means created by law." *Junior Order American Mechanics v. Tate*, 212 N.C. 305, 309, 193 S.E. 397, 399 (1937). The term "roads" in a legal sense would refer to roads established, *i.e.*, created, by law by such means as dedication, condemnation or prescription. In the case *sub judice*, petitioners may establish the existence of a neighborhood public road in a legal sense by proof of such road or roads by prescription. A subsequent section of this opinion deals with the sufficiency of the evidence to take the case to the jury on the issue of a "public road" by prescription. We deem it unnecessary to duplicate that survey of the evidence at this point in the opinion. Suffice it to say that the same evidence may support both the theory of "public road" by prescription and the theory of "neighborhood public road" established in a legal sense by prescription.

Our review of the testimony indicates that the evidence proffered by the petitioners regarding the location, nature and usage of the roads in question is adequate to permit a jury to find that either one or both of the roads in question are located outside the boundaries of any incorporated city or town, that they serve a public use and that they serve as a means of ingress and egress for one or more of petitioners' families. We thus hold that the evidence was sufficient to take the case to the jury upon the theory of neighborhood public road under the third part of N.C.G.S. § 136-67.

[4] Petitioners' last theory is that the roads in question are "*public* roads" (as opposed to "*neighborhood public* roads") through prescription based upon continuous and open public use for over twenty years.

In *Dickinson v. Pake*, 284 N.C. 576, 201 S.E. 2d 897 (1974), this Court set out the principles of law which are applicable to cases such as this one wherein a claim of an easement by prescription is made:

1. The burden of proving the elements essential to the acquisition of a prescriptive easement is on the party claiming the easement.

2. The law presumes that the use of a way over another's land is permissive or with the owner's consent unless the contrary appears.

3. The use must be adverse, hostile, or under a claim of right. . . . "To establish that a use is 'hostile' rather than permissive, 'it is not necessary to show that there was a heated controversy, or a manifestation of ill will, or that the claimant was in any sense an enemy of the owner of the servient estate.' (Citations omitted.) A 'hostile' use is simply a use of such nature and exercised under such circumstances as to manifest and give notice that the use is being made under a claim of right. . . ." There must be some evidence accompanying the user which tends to show that the use is hostile in character and tends to repel the inference that it is permissive and with the owner's consent. . . . A mere permissive use of a way over another's land, however long it may be continued, can never ripen into an easement by prescription.

4. The use must be open and notorious. "The term adverse user or possession implies a user or possession that is not only under a claim of right, but that it is open and of such character that the true owner may have notice of the claim; and this may be proven by circumstances as well as by direct evidence."

5. The adverse use must be continuous and uninterrupted for a period of twenty years. . . . "The continuity required is that the use be exercised more or less frequently, according to the purpose and nature of the easement." J. Webster, Real Estate in North Carolina § 288 (1971). An interruption to an easement for a right-of-way "would be any act, done by the owner of the servient tenement, which would prevent the full and free enjoyment of the easement, by the owner of the dominant tenement. . . ."

6. There must be substantial identity of the easement claimed. . . . "To establish a private way by prescription, the user [sic] for twenty years must be confined to a definite and specific line. While there may be slight deviations in the line of travel there must be a substantial identity of the thing enjoyed." (Citations omitted.)

284 N.C. at 580-81, 201 S.E. 2d at 900-01. *Accord Potts v. Burnette*, 301 N.C. 663, 273 S.E. 2d 285 (1981), in which this Court succinctly enumerated the elements necessary to be proved in order to establish an easement by prescription:

In order to prevail in an action to establish an easement by prescription, a plaintiff must prove the following elements by the greater weight of the evidence: (1) that the use is adverse, hostile or under claim or right; (2) that the use has been open and notorious such that the true owner had notice of the claim; (3) that the use has been continuous and uninterrupted for a period of at least twenty years; and (4) that there is substantial identity of the easement claimed throughout the twenty-year period.

301 N.C. at 666, 273 S.E. 2d at 287.

As we have previously addressed the sufficiency of the evidence in regard to the fixed location of both the Inside Road and the Pole Line Road, we deem it unnecessary to repeat that analy-

sis here. Suffice it to say that as to the enumerated elements required to establish an easement by prescription, there was abundant evidence that the public had used the two roadways openly, notoriously and continuously for decades, that no permission was obtained or sought and that these roads were the primary means of access by land to Corolla and the Currituck Banks.

Mr. Blanton Saunders who used the road from 1926 and who worked for the Pine Island Club for six or eight years testified:

I was never given any instructions to keep the public off any of the roads passing through those properties.

The reputation of the Inside Road in the community was that it was public. All of them went and came that wanted to at that time. There wasn't anybody stopping them or telling them to stop.

The reputation in the community of the Pole Line Road was that it was a public road. The public used it as much as they wanted to. Didn't anybody tell them not to go and come.

\*      \*      \*

When I went on that land, I didn't ask anybody whether I could be there or not. I didn't see anybody to ask. I never got any permission or even asked any permission because everybody else was going and coming whenever they wanted to.

Mrs. Margaret Dowdy who traveled the Inside or Soundside Road before there were automobiles, testified that the road was never closed to any one and that no one ever stopped her or told her that she could not use the road. She further testified that after 1923 when she traveled the road by automobile, no one ever stopped her or told her that she could not use the road.

Mr. Pennell A. Tillett testified that no one kept people from traveling the Inside Road and that no one ever told him he could not use the road and he thought it was a public road. He stated specifically that between 1917 and 1930 the general reputation in the community was that the Inside Road was a public road.

Mr. Leslie James Henley testified that he knew the general reputation in the community as to whether the Inside Road was known as public or private and that it was a public road.

Mr. Caleb Poyner testified in this regard as follows:

I never asked permission to use the Inside Road. From my youth until now, I have never seen any occasion to. The general reputation in the community of the Inside Road was that it was a public road. The general reputation in the community of the Pole Road was that it was a public road. I have never been stopped from traveling on the Inside Road until the present guard gate was put on the other road and the gate was closed to Pine Island. At that time, I was stopped. The gate was closed. I insisted that I go to Corolla that I had property there, and that I was going to Corolla. The gate was locked with a latch in it. I shortly thereafter went through the gate. I did not have to break down the gate. The guard opened the gate for me. I was not given permission to go through.

Mr. David H. Lawrence testified that he had done engineering and surveying work in the area of Currituck and Dare Counties since 1950 on various projects. He testified as to the reputation of the two roads as follows:

During the time I was doing these projects, I had an opportunity to learn the general reputation of the road, the Inside Road as to whether it was public or private. It was a public road. I had an opportunity to learn the reputation in the community of the Pole Line Road. It was a public road. No one ever stopped me from using either one of these roads.

B. Ray White testified in pertinent part as follows:

It would be fair to say I have been traveling south from Penny's Hill for 42 years. During that whole time no one has ever stopped me and told me I could not go through the Pine Island property. The general reputation in the community of the Pole Line Road from Poyner's Hill to Caffey's Inlet is that it is a public road. The reputation of the Inside Road from Poyner's Hill to Caffey's Inlet in the community is that it is a public road.

The evidence was sufficient to rebut the presumption of permissive use and to allow, although not compel, a jury to conclude that the use was under such circumstances as to give respondents notice that the use was open, notorious, adverse, hostile and

under claim of right with respondents' and their predecessors' full knowledge and acquiescence. Unlike the panel below, we find in the evidence presented substantial identity of the easements claimed.

The respondents argue that petitioners' evidence fails to establish an additional element required for public, as opposed to private, prescription of roads; that is, the element of "public maintenance." It is the respondents' contention that "North Carolina has always required public maintenance" as an element of public prescription of roads, relying upon *Chesson v. Jordan*, 224 N.C. 289, 29 S.E. 2d 906 (1944); *State v. Fisher*, 117 N.C. 733, 23 S.E. 158 (1895); *Stewart v. Frink*, 94 N.C. 487 (1886); *Kennedy v. Williams*, 87 N.C. 6 (1882); *Boyden v. Achenbach*, 79 N.C. 539 (1878); *Tarkington v. McRea*, 47 N.C. 47 (1854) and *Woolard v. Mc-Cullough*, 23 N.C. 432 (1841).

In their brief, petitioners take the position that the modern test requiring public maintenance, which they concede currently applies to public prescription of roads, has evolved over time and is substantially more stringent than the test applied to the taking of a road in this State's rural areas in the nineteenth and early twentieth century. The petitioners submit that as of 1931, North Carolina case law established that public maintenance of a road was *not* a prerequisite to public prescription, relying upon *Wright v. Lake Waccamaw*, 200 N.C. 616, 158 S.E. 99 (1931); *Haggard v. Mitchell*, 180 N.C. 255, 104 S.E. 561 (1920); and *Tarkington v. McRea*, 47 N.C. 47. According to the petitioners, these cases indicate that "the length and character of the public's use were the key factors, and this remained the law until 1937." The petitioners argue that this court first *required* proof of public maintenance as an essential element of public prescription in its 1937 decision of *Hemphill v. Board of Aldermen*, 212 N.C. 185, 193 S.E. 153 (1937). Petitioners' argue further that under these standards, the evidence showed public use of the Inside Road for 25 years (*i.e.*, from 1912) prior to the time that a requirement of public maintenance existed for public prescription, and that there was evidence of public maintenance of both the Inside and the Pole Line Roads during 20-year periods of prescription occurring before and after 1937.

Our examination of the applicable precedents indicates that the necessity of demonstrating "public maintenance" as an essential element in establishing the existence of a public road by prescription has not undergone a steady "evolution" as petitioners argue, but has figured prominently in some cases, while either being ignored or expressly disclaimed as an element in others.

The earliest cases on the subject of public prescription of roads fail to make any mention of public maintenance as an element, emphasizing, rather, use by the public for the requisite length of time and reputation of the road as a public way. *See, e.g., Tarkington v. McRea,* 47 N.C. 47 and *Woolard v. McCullough,* 23 N.C. 432. Later cases mention public maintenance as a factual circumstance having strong bearing on the question of adverse use by the public of the roadway claimed. *See, e.g., Boyden v. Achenbach,* 79 N.C. 539; *State v. McDaniel,* 53 N.C. 284 (1860); and *Davis v. Ramsey,* 50 N.C. 236 (1858).

In the year 1882, however, the court made two seemingly conflicting statements with regard to the necessity of demonstrating public maintenance. The first statement appears in a criminal action for obstructing a public road, *State v. Purify,* 86 N.C. 682 (1882). There, the court stated the rule as follows:

A *public highway* is one established by public authority, and kept in order by the public, under the direction of the law; *or else it is one used generally by the public for twenty years, and over which the public authorities have exercised control, and for the reparation of which they are responsible.* (Emphasis added.)

Later that year, in a civil action to enjoin the obstruction of an alleged public road, the court, *citing, inter alia, State v. Purify* and *Boyden v. Achenbach,* summarized the applicable precedents in the following manner:

According to the current decisions of this Court, there can be no *public highway,* unless it be one, either established by the public authorities in a proceeding regularly constituted before the proper tribunal; *or one generally used by the public, and over which the proper authorities have exerted control for the period of twenty years*; or one dedicated to

the public by the owner of the soil with the sanction of the authorities, and for the maintenance and reparation of which they are responsible. (Emphasis added.)

*Kennedy v. Williams*, 87 N.C. at 8.

Following the *Kennedy* decision, the court again phrased the requirements of public prescription in such a way as to strongly suggest that public maintenance was not an essential element, but rather functioned as proof of the exercise of public authority and control, necessary to show adverse, as opposed to, permissive use by the public. *See, e.g., Stewart v. Frink*, 94 N.C. 487 ("the proper public authorities must have exercised authority and control over it in some way to be seen, as by superintending and keeping it in proper repair, adversely to the owners of the land") and *State v. Fisher*, 117 N.C. 733, 23 S.E. 158 (1895) ("the best evidence of such [adverse] user is the fact that the proper authorities have appointed overseers and designated hands to work, and assumed for the public the responsibility of keeping the way in repair").

However, this view was not consistently followed by the court and a number of later cases once again take the position that public maintenance is an essential element of public prescription. *See, e.g., State v. Lucas*, 124 N.C. 804, 32 S.E. 553 (1899) (it is "still essential" that the road must have been worked and kept in order by public authority). *Accord State v. Haynie*, 169 N.C. 277, 84 S.E. 385 (1915) (obstruction of a road not an indictable offense where public authorities have not assumed the obligation to work the road and keep it in order).

A similar pattern of development is observable in later pronouncements on the subject of public maintenance. *Compare, for example, Hemphill v. Board of Aldermen*, 212 N.C. 185, 193 S.E. 153 (it is "essential" that the road must have been worked and kept in order by public authority) *with Haggard v. Mitchell*, 180 N.C. 255, 104 S.E. 561 (party claiming public road need only prove that the occupation is so general and of such kind as to permit the inference and apprise the owner that the public has assumed control of his property and is exercising it as a matter of right; it is not essential that public maintenance be performed). *See also Chesson v. Jordan*, 224 N.C. 289, 29 S.E. 2d 906 (adverse use by the public must be manifested in some appropriate way by the properly constituted public authorities) and *Wright v. Lake Wac-*

*camaw*, 200 N.C. 616, 158 S.E. 99 (public use and control exerted by the proper authorities for the period of twenty years). It is evident from the foregoing review of our case law that public maintenance is either to be considered as evidence of adverse use of a road by the public, or as an essential element, the showing of which must be made in order to establish a public road by prescription.

In *Scott v. Shackelford*, 241 N.C. 738, 86 S.E. 2d 453 (1955) Justice Higgins contrasted the maintenance requirement "[i]n early times, when the country was thinly populated, when lands were of relatively little value, when public funds for road and street construction and maintenance were simply not available . . ." with the maintenance requirement "when the State and Towns developed and larger and larger sums of money became available for highways and streets . . ." and roads were "authorized by carefully prepared proceedings." In addressing the testimony of witnesses as to the existence of a street for the period of about 1895 to 1955 Justice Higgins wrote:

> There can be no doubt but that under the old decisions of this Court the evidence of the use of the alley by the public for the time shown by the plaintiff's evidence would be amply sufficient to sustain the findings and judgment in this case. Under the later decisions, we think the facts offered, though somewhat inconclusive as proof of acceptance, constitute *some* evidence and as such will support Judge Grady's findings.

> However, as the State and the towns developed, and larger and larger sums of money became available for highways and streets, they were surveyed with mathematical exactness. They were authorized by carefully prepared proceedings. Records of surveys and plans showing the exact location were made and were available at every courthouse and town hall. The authority for the location and construction can be ascertained without difficulty. As a consequence, the recent decisions of this Court are in harmony with and recognize the change in conditions. In an opinion by *Barnhill, J.*, now *C.J.*, in the case of *Chesson v. Jordan*, 224 N.C. 289, 29 S.E. 2d 906 [1944], the Court clearly states the modern view: "According to the current of decisions in this Court, there

can be in this State no public road or highway unless it be one either established by public authorities in a proper proceeding regularly instituted before the proper tribunal; or generally used by the public and *over which the public authorities have assumed control* for a period of twenty years or more; or dedicated to the public by the owner of the soil with the sanction of the authorities and *for the maintenance and operation of which they are responsible*." (Emphasis added.)

Long after the time the alley in question here had been in use according to the plaintiff's evidence, maintenance of streets and highways generally consisted of the draining or filling up of mudholes, often by the owner of the adjacent property. Then, the use alone was sufficient to establish the right. Then, no provision or facilities were provided for maintenance. Now, it is not enough for the public to use the streets, highways or alleys for twenty years. The public authorities must assert control over them.

*Id.* at 743, 86 S.E. 2d at 457. While this statement appears in a case which involved the question of dedication of a street and acceptance thereof by the public, it serves as further illustration that the cases are in conflict as to the necessity (requirement) of showing maintenance by the public either as some evidence of the exercise of public control or as a necessary element of public prescription.

While the question of the *necessity* of proving public maintenance in order to establish a public road in this manner is an interesting one, and one about which much could be written, we find it unnecessary to address the matter in any greater detail for the purposes of this decision. Assuming *arguendo*, that a requirement of public maintenance is applicable, and although the evidence was conflicting on this issue, we find sufficient evidence of public maintenance to take the case to the jury.

While, as previously indicated, evidence as to the public maintenance of the roads in question was in conflict, evidence which would support the petitioners' claim of public maintenance included the following:

Mr. Thomas J. King, 51 years of age, who lived on the Outer Banks of Dare County virtually all of his life testified that his father was a full time State Highway Department employee and that between the years 1946 and 1948 his father worked the Soundside Road with a State Highway truck with a pull drag and also put rushes in the holes on the road. His father's job was to make the roads passable and he worked the Pole Line Road to within 100 yards of Dr. Baum's house and stopped there because the road was hard and it did not need any work.

Mr. Jesse Newman who lived on the Outer Banks since 1937 testified that he worked for the Interior Department, National Parks Service, and was familiar with the Currituck Outer Banks between Caffey's Inlet and Poyner's Hill and Corolla. His group maintained the roads that they used between Duck and Corolla and that this work was performed from 1934 to 1936. He stated that when his trucks went northward out of Duck they would put brush in the bad places to make the road passable — apparently referring to the Pole Line Road.

Mr. Lonnie Bowden testified that he lived at Penny's Hill for 69 years and that in 1937 and 1938 he was employed by the federal Work Progress Administration (WPA) driving a State truck. The truck was used to haul shells and gravel on the road south of Corolla to about halfway to Poyner's Hill.

Mr. Leslie James Henley testified that he had worked for the WPA in the area in the 1930's. He drove a truck for the WPA and hauled gravel off the beach to make a roadbed. In this testimony, Leslie Henley was referring to the Inside or Soundside Road approximately a mile and one-half north of Poyner's Hill.

Mr. Oriental Dell Beasley Henley, who had lived on the Outer Banks all of his life testified that the road was maintained "a lot" by the Coast Guard and that his father went out and worked on the roads in question.

Mr. David H. Lawrence testified that he remembered on at least one occasion riding with his father up to the Outer Banks in Currituck to see what progress was being made on some road work there. He stated that this was a Civil Works Administration (CWA) project and that he observed a road crew working. This was in the general vicinity of Caffey's Inlet and further north

toward Corolla. He specifically testified that he had seen road crews with equipment working on the road within the Pine Island property which was not a part of the CWA project. He further testified that some time in the middle 1930's he observed workmen putting myrtle bushes and limbs in holes and ruts in the Soundside Road and in soft areas along the Pole Line Road.

Mr. Lewis Milford Scarborough, a resident of Duck in the 1940's, testified that he was employed by the North Carolina Highway Commission in 1946. He stated that he knew Mr. Tom King, who was in charge of State work at Duck, and he did some work on the road north of Caffey's Inlet. The road was built with shovels and a road drag and Lewis Scarborough personally dragged the road near the clubhouse at the Pine Island property. He worked on the truck driven by Mr. Tom King. This work was done on the Inside and Soundside Roads to within 200-300 yards of the clubhouse. Scarborough stated that he was paid by the State for this work.

Mr. Griggs O'Neal, whose affidavit was offered into evidence, stated that he had seen State equipment travel on the road within the Pine Island property. He had seen trucks, road graders, and bulldozers passing through the Pine Island property going to the Corolla area. When the State road grader returned south from Corolla and within the Pine Island property it dropped the blade on the Pole Line Road. He drove on this road later after it had been graded and leveled off.

Mr. James Scarborough testified that he was 57 years old and that as a young boy he remembered accompanying his father on what they called "community" or "gentlemen's agreement road work day." This was some time around 1925 when people would meet on a certain day and use shovels and horse and cart to work the road. The ruts were filled in and the branches were trimmed out of the roadway. He stated this work "started at the Guard Camp and went as far as Dr. Baum's property and went a good half or better toward Kitty Hawk, to what they called the Mule Plant."

Upon the foregoing testimony, we find sufficient evidence to take the case to the jury on the issue of public maintenance. It cannot be said that petitioners failed to show a right to recover under *any* view of the facts which the evidence reasonably tends

to establish or that, *as a matter of law*, their evidence was insufficient to justify a verdict in their favor on this issue. Accordingly, we must vacate the trial court's judgment dismissing the action upon the granting of respondents' motion for directed verdict at the close of petitioners' evidence.[2]

[5]  We are unable to tell from our review of the record whether respondents are also denying access across their land to the petitioners and the public in general to the area known as the "foreshore." However, much of the testimony indicated that members of the public also regularly used the foreshore area to make their way to and from Corolla.

The longstanding right of the public to pass over and along the strip of land lying between the high-water mark and the low-water mark adjacent to respondents' property is well established beyond need of citation. In North Carolina private property fronting coastal water ends at the high-water mark and the property lying between the high-water mark and the low-water mark known as the "foreshore" is the property of the State.

Where is the dividing line between the property of the State and that of the littoral private owner? There is a division among the States on that question, and the groups may be conveniently labeled "high-tide" "low-tide" states.

The "strip of land between the high- and low-tide lines" is called the foreshore. . . . The high-tide states hold that private property ends at the high-water mark, and that the foreshore is the property of the state. The low-tide states, on

---

2. When the respondents in the case moved for a directed verdict at the close of the petitioners' evidence, the trial judge could have reserved his ruling. Even assuming that the respondents had offered evidence and then renewed their motion, he could have continued to reserve his ruling and allowed the case to go to the jury. Where, as here, the question of granting a directed verdict is a close one, the better practice is for the trial judge to reserve his decision on the motion and allow the case to go to the jury since (1) if the jury returns a verdict in favor of the moving party, no decision on the motion is necessary and an appeal may be avoided; (2) if the jury finds for the nonmoving party, the judge may reconsider the motion and enter a judgment notwithstanding the verdict; and (3) on appeal, if the motion proves to have been improvidently granted, the appellate court then has the option of ordering entry of the judgment on the verdict, thereby eliminating the expense and delay involved in a retrial. W. Shuford, North Carolina Civil Practice and Procedure (2d ed.), p. 380 (1981).

the other hand, fix the boundary at the low-water mark, and the foreshore is said to belong to the littoral landowner unless it has been otherwise alienated. . . .

Although the North Carolina position is somewhat obscured by the vagaries of ancient cases, . . . . North Carolina is a high-tide state. Under the old "entry and grant" statutes (which were replaced in 1959 by the State Land Act, Session Laws, 1959, c. 683, codified as Gen. Stat., c. 146), only land under non-navigable waters could be entered. Ownership which might interfere with navigation was not allowed. Therefore, littoral rights in ocean-front property did not include the title to the foreshore, which remained in the State. . . .

The State Land Act of 1959, *supra*, carries forward the distinction between navigable and non-navigable waters and provides that land under navigable waters cannot be "conveyed in fee," but that easements may be granted. G.S. 146-3. More importantly, the act creates a new subclassification for lands "which lie beneath . . . The Atlantic Ocean to a distance of three geographical miles seaward from the coastline of this State," and provides that no such lands can be "conveyed in fee." G.S. 146-3 and 146-64. There is nothing in the new act to change the general rule that ownership of the foreshore remains in the State. On the contrary, it is noteworthy that a special class was created for the protection of the foreshore and the marginal seas. We therefore adhere to our long established rule that littoral rights do not include ownership of the foreshore.

The littoral owner may, however, in exercise of his right of access, construct a pier in order to provide passage from the upland to the sea. " 'But the passage under the pier must be free and substantially unobstructed over the entire width of the foreshore. This means that from low to high water mark it must be at such a height that the public will have no difficulty in walking under it when the tide is low or in going under it in boats when the tide is high'. . . ." This language is consistent with the view we take here that the foreshore is reserved for the use of the public.

West v. Slick

The high-water mark is generally computed as a mean or average high-tide, and not as the extreme height of the water. (Citations omitted.)

*Fishing Pier, Inc. v. Town of Carolina Beach*, 277 N.C. 297, 301-03, 177 S.E. 2d 513, 516 (1970) and numerous cases cited therein.

Therefore, we once again affirm the rule that passage by the public by foot, vehicle and boat must be free and substantially unobstructed over the entire width of the foreshore adjacent to respondents' property.

We conclude that the petitioners presented sufficient evidence of the situs of the two roads on the ground by sufficiently specific and definite lines or routes of use to permit, but not require, a jury to find that either or both roads constitute neighborhood public roads under the third part of N.C.G.S. § 136-67 and public roads through prescription based upon continuous, adverse and open public use for more than twenty years. The decision of the Court of Appeals is therefore reversed. The trial court's judgment directing a verdict for respondents and dismissing the action is vacated and the cause is remanded to the Court of Appeals for further remand to the Superior Court, Pasquotank County, for further proceedings not inconsistent with this opinion.

In the event the petitioners should eventually prevail in having the court declare either or both of the roads in question as neighborhood public roads or as public roads by prescription, the trial court must describe the roads in the judgment so as to give notice to public authorities, to the titleholder, his successors and to all others concerned. Should the trial court require expert assistance in establishing the description it has ample authority to acquire it.

[6] We have carefully considered respondents' argument to the effect that the Court of Appeals erred in overruling respondents' motion to dismiss petitioners' appeal for failure to make assignments of error and group exceptions. The petitioners' exception to the ruling of the trial court granting the directed verdict was made in apt time. The appeal itself is an exception to the judgment. The Court of Appeals correctly ruled that the petitioners satisfied the requirements of Rule 10 of the Rules of Appellate Procedure.

Reversed and remanded.

Justices MITCHELL and VAUGHN did not participate in the consideration or decision of this case.