C. WAYNE CRAWFORD AND LYNN P. CRAWFORD, PLAINTIFFS v. COLON S. MINTZ, JR., WILLIAM R. OWENS, AND BFD PROPERTIES, INC. D/B/A RE/MAX PROPERTY ASSOCIATES, DEFENDANTS

No. COA07-141

(Filed 4 December 2007)

**1. Appeal and Error— preservation of issues—failure to argue**

Although plaintiffs contend the trial court erred by granting defendants' summary judgment motion as to plaintiffs' unfair and deceptive trade practices case, this argument is dismissed because plaintiffs failed to argue this assignment of error and thus it is deemed abandoned.

**2. Fraud— negligent misrepresentation—reliance—MLS listing for sale of home missing disclaimer**

The trial court erred by denying defendant real estate brokers' motion for a directed verdict on plaintiff buyers' claim of negligent misrepresentation arising from information defendants listed on the Multiple Listing Service (MLS) system for the sale of a home stating the pertinent house was connected to the city sewer when in fact it was connected to a septic tank, because: (1) at the time defendants entered information into the MLS system and the time when plaintiffs received that information from plaintiff's real estate agent, an important disclaimer stating that the information was deemed reliable but not guaranteed was somehow omitted; (2) the omission of the disclaimer was a material change in the transmitted information since the accuracy of representations made in MLS listings can be fully understood only when considered alongside any accompanying disclaimers; and (3) a buyer cannot demonstrate reliance on a representation

CRAWFORD v. MINTZ

[187 N.C. App. 378 (2007)]

made in an MLS listing unless that buyer relied on a version of the MLS listing containing the same qualifying language as was originally entered by the listing agent.

Judge STEELMAN dissenting.

Appeal by Plaintiffs from order dated 18 July 2003 by Judge Alice Stubbs in District Court, Wake County; from order dated 22 December 2004 by Judge Jane Gray in District Court, Wake County; and from order dated 11 May 2006 by Judge James R. Fullwood in District Court, Wake County. Appeal by Defendants from order entered 11 May 2006 *nunc pro tunc* 25 July 2005 by Judge James R. Fullwood in District Court, Wake County; and from judgment entered 11 May 2006 by Judge James R. Fullwood in District Court, Wake County. Heard in the Court of Appeals 12 September 2007.

*Everett, Gaskins, Hancock & Stevens, LLP, by E.D. Gaskins, Jr. and Michael J. Tadych, for Plaintiffs.*

*McDaniel & Anderson, LLP, by John M. Kirby and William E. Anderson, for Defendants.*

McGEE, Judge.

Thomas Proctor (Mr. Proctor) and Lois Proctor (Ms. Proctor) (collectively, the Proctors) owned a house in Raleigh, North Carolina. The Proctors decided to sell their house in 1997 and contacted Re/Max Property Associates (Defendant Re/Max) for assistance in selling the house. Re/Max agent Colon S. "Semi" Mintz, Jr. (Defendant Mintz) listed the house for the Proctors. William R. Owens (Defendant Owens) was the supervising broker in charge of the Re/Max office.

To assist the Proctors in finding a buyer for their house, Defendant Mintz entered information about the house into a database known as the Multiple Listing Service (MLS). At trial, Defendant Owens described the purpose of the MLS:

[W]e produce MLS sheets as an invitation for other agents. It's information that is put into the local MLS. They—our associates, if we list something, they—they put all the information in that they can in order to attract another agent to hopefully find it an acceptable offering for their buyer. If their buyers are out there searching for a three-bedroom, two-and-a-half-bath ranch or something like that, that information goes in, and that's basically

CRAWFORD v. MINTZ

[187 N.C. App. 378 (2007)]

what it is. "Here's an invitation, come take a look at it, see if you like it." And it's just a presentation to the other agents.

Among information Defendant Mintz entered into the MLS was a statement that the Proctors' house was connected to the city sewer. In fact, the Proctors' house was connected to a septic tank. It was not clear why Defendant Mintz thought the house was connected to the city sewer. At trial, Mr. Proctor testified that he could not recall Defendant Mintz ever having asked him if the house was on the city sewer system or on a septic tank. In addition to the sewage system representation, the MLS report for the Proctors' house included the following disclaimer, set off by asterisks: "Information deemed RELIABLE but not GUARANTEED." The MLS report also included a notation stating that the listing was "[p]repared by Judy & Semi Mintz on October 16, 1997."

Wayne Crawford (Mr. Crawford) and Lynn Crawford (Ms. Crawford) (collectively, Plaintiffs) were interested in purchasing a house in Raleigh to rent to their daughter and her roommates. In late 1997 or early 1998, Plaintiffs retained real estate agent Lou Garrabrant (Ms. Garrabrant) to assist them in finding an appropriate house to purchase. Ms. Garrabrant obtained information from Plaintiffs regarding the type of house in which they were interested, and entered the information into the MLS database. Ms. Garrabrant shared the results of her search with Plaintiffs, but Plaintiffs did not develop an interest in any of the properties found through Ms. Garrabrant's initial MLS search. In addition to searching through MLS listings, Plaintiffs drove through certain neighborhoods looking for "for sale" properties. Plaintiffs originally became interested in the Proctors' house after driving by the house and viewing it from the street. Plaintiffs informed Ms. Garrabrant of their interest in the Proctors' house. Ms. Garrabrant accessed the MLS listing for the Proctors' house and printed out a copy of the MLS report for Plaintiffs. However, the version of the listing Plaintiffs received from Ms. Garrabrant was different in two relevant respects from the original MLS listing prepared by Defendant Mintz. First, the printout of the MLS report contained a notation stating that it was "[p]repared by: Lou Garrabrant on January 26, 1998," rather than by Defendant Mintz. Second, the printout of the MLS report did not contain the "Information deemed RELIABLE but not GUARANTEED" disclaimer.

After viewing the MLS listing, Plaintiffs performed an initial visual inspection of the Proctors' house and property. During that inspection, Mr. Crawford entered the crawlspace of the house and

observed the sewage plumbing pipes. Plaintiffs later hired a professional inspector to go over the property. The inspector performed a basic examination of the sewage system, and determined that the sewage system and plumbing functioned properly. However, Plaintiffs and the inspector never discussed whether the Proctors' house had a septic tank. Rather, Plaintiffs continued to believe that the house was connected to the city sewer, as noted in the MLS report.

The Proctors and Plaintiffs entered into an "Offer to Purchase and Contract" agreement on or around 2 February 1998. The Proctors conveyed the property to Plaintiffs on or around 20 March 1998. By the closing date, Plaintiffs had inspected the Proctors' house multiple times. Ms. Crawford admitted at trial that she never asked the Proctors—or any other person—whether the house had a septic tank or whether it was connected to the city sewer.

After purchasing the property, Plaintiffs rented the house to their daughter and her roommates, including a woman named Beverly Bowles (Ms. Bowles). While mowing the lawn one day in March 2000, Ms. Bowles discovered that a portion of the yard was covered in raw sewage. Mr. Crawford hired a plumber to repair what he assumed was a damaged sewer pipe. The plumber informed Mr. Crawford that, in fact, the house was connected to a septic tank, and a leak in the septic system had caused the problem. Plaintiffs hired a septic tank service company to pump out the tank. Plaintiffs also contacted Defendant Mintz and requested that Defendant Re/Max pay for the cost of repairing the septic tank, as well as the cost of connecting the house to the city sewer. While Plaintiffs and Defendant Mintz were negotiating a solution, the septic tank overflowed again in September 2000 and Plaintiffs had the tank pumped out a second time. Plaintiffs hired an attorney and contacted the Proctors for help in resolving the situation. Eventually, Plaintiffs themselves paid to repair the septic tank and to connect to the city sewer.

[1] Plaintiffs filed a claim for negligent misrepresentation against the Proctors and Defendants on 13 November 2001. Plaintiffs also filed a claim against Defendants for unfair and deceptive trade practices. Plaintiffs' complaint included a request for attorneys' fees. The trial court granted summary judgment against Plaintiffs on the question of attorneys' fees on 18 July 2003. Plaintiffs later dismissed their claim against the Proctors on 29 October 2004. The trial court granted Defendants' summary judgment motion as to Plaintiffs' unfair and deceptive trade practices claim on 29 December 2004. Plaintiffs then proceeded to trial on their remaining negligent misrepresentation

claim against Defendants on 31 October 2005. At the close of Plaintiffs'. evidence, Defendants moved for a directed verdict. The trial court denied Defendants' motion. The jury subsequently found Defendants liable to Plaintiffs in the amount of $7,278.00, a sum roughly equal to Plaintiffs' cost of repairing the septic tank and connecting the house to the city sewer. Plaintiffs renewed their motion for attorneys' fees, but the trial court denied Plaintiffs' motion. Plaintiffs appeal the trial court's denial of their original and renewed motions for attorneys' fees. Plaintiffs also appeal the trial court's granting of Defendants' summary judgment motion as to Plaintiffs' unfair and deceptive trade practices claim; however, Plaintiffs failed to argue this assignment of error and it is therefore deemed abandoned. *See* N.C.R. App. P. 28(b)(6). Defendants appeal the final judgment against them.

[2] We first consider Defendants' argument that the trial court erred in denying Defendants' motion for a directed verdict. When ruling on a motion for a directed verdict, a trial court "must view the evidence in the light most favorable to the nonmovant, resolving all conflicts in. his favor and giving him the benefit of every inference that could reasonably be drawn from the evidence in his favor." *West v. Slick*, 313 N.C. 33, 40, 326 S.E.2d 601, 605 (1985). The trial court may only grant the motion if "the evidence, when so considered, is insufficient to support a verdict in the nonmovant's favor." *Id.* at 40, 326 S.E.2d at 606. We apply de novo review to a trial court's denial of a motion for a directed verdict. *Denson v. Richmond Cty.*, 159 N.C. App. 408, 411, 583 S.E.2d 318, 320 (2003).

A party establishes a claim for negligent misrepresentation when that party: "[(1)] justifiably relies [(2)] to his detriment [(3)] on information prepared without reasonable care [(4)] by one who owed the relying party a duty of care." *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988). Defendants contend, *inter alia*, that Plaintiffs failed to present sufficient evidence of element one. Specifically, Defendants argue that although the information they entered into the MLS database was inaccurate, Plaintiffs never received the actual version of the MLS report prepared by Defendants. Rather, Defendants claim that the information they entered was altered and transmitted to Plaintiffs by a third party such that Plaintiffs received a materially different version of the MLS report than the version originally prepared by Defendants. Therefore, according to Defendants, Plaintiffs cannot claim they directly relied on information provided by Defendants.

CRAWFORD v. MINTZ

[187 N.C. App. 378 (2007)]

Defendants rely on *Raritan* for the proposition that a claim for negligent misrepresentation will not lie if the complaining party did not directly rely on information provided by the defendant. In *Raritan,* the plaintiff steel company (Raritan) sued an accounting firm for losses it incurred when it allegedly relied on inaccurate information contained in an audit report. According to Raritan's complaint, the Intercontinental Metals Corporation (IMC) had previously hired the accounting firm to prepare an audit of IMC's financial statements. *Raritan,* 322 N.C. at 203, 367 S.E.2d at 611. The accounting firm completed and published its report. *Id.* at 204, 367 S.E.2d at 612. A number of months later, IMC ordered a large quantity of raw steel from Raritan on an open credit account. *Id.* at 205, 367 S.E.2d at 612. In order to determine whether to extend this credit to IMC, Raritan investigated IMC's financial position. As part of its investigation, Raritan allegedly relied on a Dun & Bradstreet report describing IMC's net worth. *Id.* The Dun & Bradstreet report specifically referenced the accounting firm's published audit as the source for this information. *Id.* Satisfied with IMC's financial status, Raritan extended over two million dollars of credit to IMC. *Id.* However, Raritan later incurred losses as a result of this transaction. It sued the accounting firm, claiming that the firm had negligently misrepresented IMC's net worth to Raritan. *Id.* at 203, 367 S.E.2d at 611.

At trial, the defendant accounting firm brought a motion to dismiss Raritan's claim under N.C.R. Civ. P. 12(b)(6). According to the defendant, Raritan's complaint failed to state a proper claim for negligent misrepresentation because Raritan admitted to having relied not on the defendant's actual audit, but rather on the Dun & Bradstreet report that referenced the defendant's published audit. *Id.* at 204, 367 S.E.2d at 611. The trial court granted the defendant's motion to dismiss, and Raritan appealed. *Id.* Our Supreme Court affirmed the trial court's ruling:

> Raritan alleges that it got the financial information upon which it relied, essentially IMC's net worth, not from the audited statements themselves, but from information contained in Dun & Bradstreet. This allegation, we conclude, defeats Raritan's claim for negligent misrepresentation so as to render it dismissible under Rule 12(b)(6).
>
> . . . We conclude that a party cannot show justifiable reliance on information contained in audited financial statements without showing that he relied upon the actual financial statements themselves to obtain this information.

*Id.* at 205-06, 367 S.E.2d at 612. The Court specifically stressed that when a party relies on an isolated piece of data not presented in its original form, there is a danger that the party may be relying on incomplete information:

> Isolated statements in the [audit] report, particularly the net worth figure, do not meaningfully stand alone; rather, they are interdependent and can be fully understood and justifiably relied on only when considered in the context of the entire report, including any qualifications of the auditor's opinion and any explanatory footnotes included in the statements.

*Id.* at 207, 367 S.E.2d at 613. The *Raritan* Court limited its holding to cases involving audited financial statements. It did not address reliance issues involving other types of documents, such as MLS reports. Nonetheless, the Court's reasoning in *Raritan* informs our decision in the case before us today.

The *Raritan* Court was chiefly concerned with two aspects of the alleged reliance in that case. First, the plaintiff did not rely on information received directly from the defendant. Second, the manner in which the information prepared by the defendant was disseminated to the plaintiff raised concerns regarding the reliability of the information.

Both of these concerns are present in the case before us. First, Plaintiffs did not receive the MLS report directly from Defendants. Rather, Defendants posted certain information into an online database, and Plaintiffs accessed this information through the help of two additional intermediaries: the MLS system and Plaintiffs' real estate agent, Ms. Garrabrant. Indeed, Plaintiffs' copy of the MLS report clearly states that it was prepared by Ms. Garrabrant, rather than by Defendants. We recognize that third-party dissemination alone is not always sufficient to negate a claim of negligent misrepresentation. Where the third party acts as a passive intermediary between the party making the representation and the intended recipient, it cannot be said that the mere existence of the third party destroys the possibility of reliance. However, as *Raritan* suggests, the existence of a third-party intermediary may destroy the possibility of reliance when the intermediary's involvement has a material effect on the reliability or completeness of the information being transferred.

In this case, the information Defendants transmitted passed through two intermediaries—the MLS system, and Ms. Garrabrant—

before Plaintiffs obtained it. There was no evidence that Ms. Garrabrant intended for her involvement to affect the reliability of the information contained in the MLS listing. Likewise, there was no evidence that one purpose of the MLS service was to alter the information it stored. In fact, the opposite is true: the MLS system appears to have been designed to pass unaltered information to buyers' agents exactly as that information was entered by sellers' agents. In theory, then, these two intermediaries should have had no material effect on the information Defendants transmitted to Plaintiffs.

The evidence suggests, however, that at some point between the time when Defendants entered the information into the MLS system and the time when Plaintiffs received that information from Ms. Garrabrant, an important disclaimer was somehow omitted. Defendants' copy of the MLS listing for the Proctors' house included the following language: "Information deemed RELIABLE but not GUARANTEED." Plaintiffs' copy of the same MLS listing does not contain this disclaimer. The record is unclear as to why the copy of the MLS listing printed by Ms. Garrabrant did not contain this language. Defendant Owens testified at trial that he believed a similar disclaimer appeared "on most every company's [listings] in the MLS. So if you look at an MLS sheet and it's not on there, I would be very surprised." Ms. Garrabrant testified that when she printed the MLS listing, the disclaimer might have printed onto a second page that was not attached to the copy Plaintiffs received. Ms. Garrabrant could not recall whether she had ever shared that disclaimer with Plaintiffs.

The omission of the disclaimer was clearly a material change in the transmitted information. The *Raritan* Court stressed that certain types of information "can be fully understood and justifiably relied on only when considered in the context of . . . any qualifications . . . and any explanatory footnotes." *Raritan*, 322 N.C. at 207, 367 S.E.2d at 613. Our Courts have not addressed whether representations made in MLS listings can likewise be fully understood only when considered in light of accompanying disclaimers. A decision from one of our neighboring jurisdictions, however, suggests an affirmative answer to this question, at least with regard to square-footage representations. In *Schnellmann v. Roettger*, 627 S.E.2d 742 (S.C. App. 2006), *aff'd by* 645 S.E.2d 239 (S.C. 2007), a South Carolina real estate listing agent advertised a certain house through a local MLS system. The agent listed the square footage of the house as 3,350 square feet. *Id.* at 744. The MLS report also included a disclaimer stating that the square

footage listed was "deemed reliable but not guaranteed," and advised that "IF EXACT SQUARE FOOTAGE IS IMPORTANT TO YOU, MEASURE, MEASURE!" *Id.* Prospective buyers obtained the MLS report for the property and subsequently purchased the house. They later discovered that the actual square footage of the house was closer to 3,000 square feet, *id.*, and filed a claim against the listing agent for negligent misrepresentation. The South Carolina Court of Appeals rejected the buyers' claim. Noting that the buyers "were informed via the MLS listing that the measurements were not precise," the court held that "if the [buyers] relied on the approximation of the square footage contained in the listing, such reliance was unreasonable as a matter of law." *Id.* at 745.

We need not decide whether the existence of a disclaimer in an MLS listing negates the justifiable reliance element of a claim for negligent misrepresentation in North Carolina. It is sufficient for us to recognize that such disclaimers are material provisions in MLS listings that may have important consequences for the legal rights and responsibilities of real estate purchasers, sellers, and their agents. The accuracy of representations made in MLS listings can be fully understood only when considered alongside any accompanying disclaimers. Therefore, we hold that a buyer cannot demonstrate reliance on a representation made in an MLS listing unless that buyer relied on a version of the MLS listing containing the same qualifying language as was originally entered by the listing agent. Plaintiffs have thus failed to satisfy a requisite element of a claim for negligent misrepresentation. The trial court therefore erred in denying Defendants' motion for a directed verdict at the close of Plaintiffs' evidence.

In light of the foregoing, we do not address the parties' remaining assignments of error.

Reversed.

Judge ELMORE concurs.

Judge STEELMAN dissents with a separate opinion.

STEELMAN, Judge, dissenting.

I must respectfully dissent from the majority opinion that reverses the jury verdict based upon its interpretation of the Supreme Court decision in *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 367 S.E.2d 609 (1988).

**CRAWFORD v. MINTZ**

[187 N.C. App. 378 (2007)]

The majority opinion, based upon *Raritan*, cites two concerns as to plaintiffs' reliance upon the MLS report: (1) the information was not received directly from defendants by plaintiffs; and (2) the manner of the dissemination of the information raised concerns about its reliability.

*Raritan* involved a suit by creditors against debtor's certified public accountant for negligent misrepresentation of the net worth of the debtor. One of the creditors, Raritan River Steel Company, did not rely directly upon the accountant's audited financial statement, but rather upon a Dun & Bradstreet report that referenced the accountants as the source of its information. The Supreme Court held that the trial court properly dismissed Raritan's claim against the accountants, stating:

> Our holding that reliance on the audited financial statements is required in these kinds of cases stems in part from an understanding of the audit report. An audit report represents the auditor's opinion of the accuracy of the client's financial statements at a given period of time. *See generally* R. Gormley, *The Law of Accountants and Auditors 1-26* (1981). The financial statements themselves are the representations of management, not the auditor. B. Ferst, *Basic Accounting for Lawyers* 11 (3d ed. 1975). Isolated statements in the report, particularly the net worth figure, do not meaningfully stand alone; rather, they are interdependent and can be fully understood and justifiably relied on only when considered in the context of the entire report, including any qualifications of the auditor's opinion and any explanatory footnotes included in the statements.

*Raritan* at 207, 367 S.E.2d at 613.

The representation in the MLS report that the Proctors' house was connected to city sewer is in no manner interconnected with any of the other representations in the report. Rather, this representation stands completely alone.

The instant case is procedurally in a different posture than *Raritan*. The complaint in *Raritan* affirmatively stated that Raritan Steel had relied upon representations of net worth contained in the Dun & Bradstreet report, not the accountant's report. There was nothing in the record showing that the information in the Dun & Bradstreet report was the same as that contained in the accountant's report. In the instant case, this court is reviewing the trial court's denial of defendants' motion for a directed verdict. As noted by the

majority, we are required to view the evidence presented in the light most favorable to the plaintiffs, and can only overturn the trial court's decision if the evidence was insufficient to support a verdict in favor of plaintiffs.

In the instant case, the evidence was uncontroverted that the Proctors' agent, Mintz, entered into the MLS listing that the property was served by city sewer. It is also uncontroverted that this information was false. There was evidence that plaintiffs' real estate agent, Garrabrant, printed out a copy of the MLS listing, and that this printout failed to contain the language "Information deemed RELIABLE but not guaranteed." However, this evidence does not change the fundamental fact that the express representation of the sewer connection was false, and that the actions of Garrabrant in no way altered this representation.

Thus, based upon the unaltered state of the representation that the property was not served by city sewer, and that this representation was not interconnected with other representations in the MLS report, the rationale of *Raritan* is not applicable.

There was evidence presented at trial that plaintiffs relied upon this representation in purchasing the property. I would hold that the evidence pertaining to the printing of the MLS listing by Garrabrant does not support the dismissal of plaintiffs' claims, but rather goes to the question of whether the plaintiffs relied upon the MLS listing, and whether any reliance was justifiable. It was for the jury to determine the credibility of the witnesses, and the weight to be given to the evidence. The trial court properly submitted the issue of justifiable reliance to the jury. I would hold that no error was committed by the trial court in denying defendants' motion for directed verdict.