W. A. DAVIS REALTY, INC., D/B/A W. A. DAVIS MILLING COMPANY v. WAKELON AGRI-PRODUCTS, INC.

No. 8518SC1093

(Filed 20 January 1987)

Contracts § 27.2; Sales §§ 5, 6— sale of wheat—breach of contract—breach of implied and express warranties—negligence—directed verdict improper

In an action to recover for losses allegedly sustained because defendant supplied plaintiff with "sick wheat" instead of sound, wholesome Number 2 milling wheat, the commodity bargained for, plaintiff's evidence was sufficient to support claims for breach of contract, breach of express and implied warranties and negligence where plaintiff offered evidence tending to show that "sick wheat" caused plaintiff's flour to make defective biscuits to the dissatisfaction of its customers and its own pecuniary loss; defendant made several different deliveries of "sick wheat" to plaintiff during the period involved; "sick wheat" is a rare condition and thus not likely to be found in every supplier's bin or delivery; defendant stored all the wheat involved in the same bin over the winter, a storage practice which often results in "sick wheat"; much of defendant's wheat was converted into biscuits within 10 days after it was delivered to plaintiff; about 10 days or so after defendant's first delivery of wheat to plaintiff, its customers began to complain about plaintiff's flour not making satisfactory biscuits and the complaints continued during the rest of the month; and during the period from 3 April through 1 May, defendant's deliveries amounted to 1,065,200 pounds while those of all other suppliers amounted to only 387,075 pounds, 200,000 pounds of which were delivered by one supplier on one day, 16 April—too late to be the cause of the complaints which had already been received and which were received during the several days that followed. N.C.G.S. 25-2-313, 25-2-314, and 25-2-315.

APPEAL by plaintiff from *Davis, James C., Judge.* Judgment entered 17 May 1985 in Superior Court, GUILFORD County. Heard in the Court of Appeals 4 March 1986.

Plaintiff milling company, which produces self-rising flour at its High Point mill and sells it to certain fast food restaurants, sued to recover losses allegedly sustained because during the month of April 1980 defendant supplied it with "sick wheat"— wheat with a dead or deteriorating wheat germ that is not suitable for self-rising flour—instead of sound, wholesome U. S. Department of Agriculture grade Number 2 milling wheat, the commodity bargained for. The theories asserted for relief were breach of express warranty, breach of implied warranty, breach of contract, and negligence. At the end of plaintiff's evidence the court directed a verdict against all claims and entered judgment for defendant.

Viewed in its most favorable light plaintiff's evidence in pertinent part was to the following effect: During the month of April, 1980 plaintiff bought 1,015,530 pounds of wheat from defendant, all of which was supposed to be grade Number 2 according to U.S. Department of Agriculture standards. Under those standards wheat is graded according to the percentage of defective kernels and foreign material that it contains and Number 2 wheat contains no more than 5% total defects. Throughout the month of April defendant delivered wheat to plaintiff's mill in trailer load lots, each of which weighed approximately 43,000 pounds; deliveries were made almost daily, and sometimes twice a day, and all the wheat so delivered had been stored in the same bin since the preceding November. Upon receiving a delivery of wheat plaintiff usually milled it into baking flour that day or the next and immediately delivered the flour to its customers, among which were Fast Food Merchandisers (Hardees), Burlington Distributors, Inc. (Biscuitville), Mayberry Distributing and the Biscuit Shoppe. Upon delivery the flour was usually put in the customers' warehouses where it stayed for two or three days before being delivered to a restaurant, where it stayed on the shelf for five or six days before being made into biscuits. Plaintiff's biggest customer, Fast Food Merchandisers, usually maintained no more than two or three days' inventory in its warehouse, but in a lot of instances had no inventory at all and their trucks were waiting for plaintiff's truck to arrive. About the middle of April plaintiff's biscuit-making customers began complaining that the flour sent them was not producing acceptable biscuits; their complaints, which continued through the rest of the month, were that the biscuits would not rise, and were gray in color. Of the wheat that plaintiff received and milled that month over 75% of it was supplied by defendant and during the period between 18 April and 28 April, when most of the complaints were made, more than 90% of the wheat plaintiff milled was received from the defendant. As the complaints increased plaintiff had several different deliveries of defendant's wheat tested by State Agriculture Department inspectors. On 25 April 1980 local inspectors tested two trailer loads of wheat that defendant had delivered that day; one load had 24.6% total defects and was rejected, the other load had 7.9% total defects, but was kept and used by combining it with higher grade wheats. Two samples of wheat from deliveries defendant made on 28 April were sent to the State Department of

---

**Davis Realty, Inc. v. Wakelon Agri-Products, Inc.**

---

Agriculture in Raleigh and the official grain inspector found one sample had 15.1% total defects and was Number 5 wheat, and the other had 38.8% total defects. An inspection at plaintiff's mill of a delivery made 30 April revealed that the wheat was musty and had 34.6% total defects, as well as an off odor. An Agriculture Department inspector, who either made or was familiar with all the inspections, described 95% of the defective kernels found as "sick wheat," which is rarely found in Number 2 wheat. An expert in cereal chemistry testified that: "Sick wheat" is the result of poor storage conditions; is a degenerative process in which the germ and then the remainder of the wheat kernel die; is not easily detected; is a condition where the germ dies, creating a dead organism which is difficult to store; and that flour milled from "sick wheat" loses the gas retention ability that permits flour products to rise and the products baked from "sick wheat" can be gray in color. Plaintiff did not have tests made on any wheat received from its other suppliers; and defendant did not test or inspect the wheat it delivered to plaintiff, either to insure that it was grade Number 2 wheat or that it was not "sick wheat." Plaintiff had to take back the defective flour that its customers still had and replace it with flour obtained from other suppliers; and because of the defective flour supplied them some of plaintiff's best customers stopped buying flour from it altogether.

*Womble, Carlyle, Sandridge & Rice, by Keith W. Vaughan and Robert C. Dortch, Jr., for plaintiff appellant.*

*Henson, Henson & Bayliss, by Perry C. Henson and Paul D. Coates, for defendant appellee.*

PHILLIPS, Judge.

Quite clearly, it seems to us, plaintiff's evidence, when viewed in its most favorable light, *West v. Slick*, 313 N.C. 33, 326 S.E. 2d 601 (1985), makes out a *prima facie* case on all the claims asserted. That the grade or quality of goods bought and sold can be contracted for is rudimentary; and that an agreement as to the grade or quality of goods bought and sold can be the basis for an express warranty is expressly provided by statute. G.S. 25-2-313. The main thrust of plaintiff's evidence is that defendant contracted or expressly warranted to provide Number 2 milling wheat, a commodity with few defective kernels, and breached its obligation

YALE LAW LIBRARY

by supplying wheat of an inferior standard that contained a high percentage of defective kernels. The same evidence, along with evidence that defendant knew that plaintiff was milling wheat into flour for human consumption and was relying upon defendant to furnish wheat suitable for that purpose, supports the claims that defendant made and breached the implied warranty of merchantability, G.S. 25-2-314, and the implied warranty of fitness for a particular purpose, G.S. 25-2-315. Under the circumstances recorded whether these warranties were made or breached were questions of fact, not law. *Pake v. Byrd*, 55 N.C. App. 551, 286 S.E. 2d 588 (1982). And the evidence that Wakelon stored the wheat involved over the winter, a practice that can cause "sick wheat," and did not inspect it prior to shipment is some evidence at least that it failed to use reasonable care in supplying plaintiff with a product free from hidden defects. *Wilson v. Lowe's Asheboro Hardware, Inc.*, 259 N.C. 660, 131 S.E. 2d 501 (1963). Nor was plaintiff contributorily negligent as a matter of law because it did not inspect the earlier deliveries received from defendant. The evidence does not indicate that plaintiff knew or should have known of defendant's storage practices until near the end of the month when the customers' complaints were being investigated; nor does it indicate that in the exercise of due care plaintiff was required to inspect for this rare condition before accepting the different shipments delivered. The inspection described by the evidence required more than just looking at the wheat; it involved peeling the bran from the surface area of the germ; and whether such an inspection should have been made is also a question of fact, not law.

Plaintiff's evidence is also sufficient to support but not require a finding that defendant's breaches and negligence proximately caused at least some of the damage that plaintiff's evidence tends to show was sustained. That the evidence does not exclude the possibility that other suppliers also supplied it with "sick wheat" during the period involved is not fatal to plaintiff's claims as defendant maintains. To have a jury pass on its case plaintiff was not required to show to a scientific certainty that defendant's defective merchandise was the sole cause of the damage claimed; it only had to show that defendant's product *probably caused* some of the damage sustained. *Stanback v. Stanback*, 297 N.C. 181, 254 S.E. 2d 611 (1979); 9 Strong's Index 3d,

*Negligence* Secs. 9 and 10 (1977). This the plaintiff did by presenting evidence indicating the following: That "sick wheat" caused plaintiff's flour to make defective biscuits to the dissatisfaction of its customers and its own pecuniary loss; that defendant made several different deliveries of "sick wheat" to plaintiff during the period involved; that "sick wheat" is a rare condition, and thus not likely to be found in every supplier's bin or delivery; that defendant stored all the wheat involved in the same bin over the winter, a storage practice that often results in "sick wheat"; that much of defendant's wheat was converted into biscuits within ten days after it was delivered to plaintiff; that about ten days or so after defendant's first delivery of wheat to plaintiff its customers began to complain about plaintiff's flour not making satisfactory biscuits and the complaints continued during the rest of the month; and that during the period from April 3rd through May 1st Wakelon's deliveries amounted to 1,065,200 pounds and those of all the other suppliers amounted to only 387,075 pounds, 200,000 pounds of which were delivered by one supplier, Central Soya, on one day, April 16th—too late to be the cause of the complaints that had already been received and the complaints that were received during the several days that followed.

Vacated and remanded for a new trial.

Judges ARNOLD and EAGLES concur.