Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp., 2018 NCBC 83.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION |
| DAVIE COUNTY | 16 CVS 217 |

| | |
|---|---|
| KERRY BODENHAMER FARMS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>NATURE'S PEARL CORPORATION; JERRY SMITH; and LE BLEU CORPORATION,<br><br>Defendants. | **ORDER AND OPINION ON MOTIONS FOR SUMMARY JUDGMENT** |

1. Over the last ten years, Plaintiff Kerry Bodenhamer Farms, LLC ("KB Farms") has sold hundreds of tons of muscadine grapes to Defendant Nature's Pearl Corporation. This dispute concerns a single shipment of grapes during the 2014 harvest. KB Farms contends that Nature's Pearl improperly refused to pay for the grapes. Nature's Pearl says they were fermented and thus unusable. Each accuses the other of breaching the governing contract (with KB Farms asserting that Nature's Pearl's owner, Jerry Smith, and an affiliate, Le Bleu Corporation, should also be liable for Nature's Pearl's alleged breach).

2. The parties' motions for summary judgment are pending. For the following reasons, the Court **GRANTS** Defendants' motion and **GRANTS in part** and **DENIES in part** Plaintiff's motion.

*Wyche, P.A., by Wade S. Kolb III, Matthew T. Richardson, and Eric B. Amstutz, and Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Kearns Davis and Jessica Thaller-Moran, for Plaintiff Kerry Bodenhamer Farms, LLC.*

*Nelson Mullins Riley & Scarborough, LLP, by G. Gray Wilson and Lorin J. Lapidus, for Defendants Nature's Pearl Corporation, Jerry Smith, and Le Bleu Corporation.*

Conrad, Judge.

## I.
## BACKGROUND

3. The Court does not make findings of fact in ruling on motions for summary judgment. The following background, describing the evidence and noting relevant disputes, is therefore intended only to provide context for the Court's analysis and ruling.

4. Nature's Pearl sells juices, nutritional supplements, and similar products made from muscadine grapes. (Compl. ¶ 7, ECF No. 1; Answer ¶ 7, ECF No. 3.) KB Farms is one of its grape suppliers. (*See* Compl. ¶¶ 12–14; Answer ¶¶ 12–14.) From 2008 through 2011, the two companies did business subject to yearly oral agreements in which Nature's Pearl purchased KB Farms' grape harvests, paying a fixed price per ton. (*See* Compl. ¶¶ 12–14; Answer ¶¶ 12–14; Countercl. ¶ 6.)

5. In January 2012, Nature's Pearl and KB Farms executed a written contract ("Agreement"). Nature's Pearl obtained "the sole and exclusive right to purchase all of [KB Farms'] muscadine grapes ('whole grapes') on an annual basis" for 20 years. (Compl. Ex. A ["Agreement"] ¶¶ 1, 8.) In return, it agreed to pay $700 per ton for the 2012 harvest, with future years' prices to be determined by "market conditions." (Agreement ¶ 2.) The Agreement was signed by each company's owner and principal—Jerry Smith for Nature's Pearl, and Kerry Bodenhamer for KB Farms. (*See* Agreement p.5.)

6.      Grapes are, of course, perishable.  The Agreement required KB Farms to ship all grapes "in refrigerated trucks" on "the same day that they [were] harvested." (Agreement ¶ 5.)  So long as the grapes were of "good quality," Nature's Pearl was required to purchase them, though it reserved the right to "make the sole determination as to the quality of the product at the time of processing the whole grapes" and also "the right to reject any whole grapes" it determined "to be unusable." (Agreement ¶ 4.)

> Specifically, [Nature's Pearl] will reject all whole grapes that it determines to be spoiled, rotten, molded, fermented or do not meet a minimum of 15 bri[x] sugar content at the time of processing.  If [Nature's Pearl] rejects any whole grapes pursuant to the terms and conditions of this Agreement, it will immediately notify [KB Farms], and [KB Farms] shall have the right to come to [Nature's Pearl's] place of business to inspect the rejected whole grapes, pay to ship the rejected whole grapes back to its facility or authorize [Nature's Pearl] to dispose of the whole grapes.

(Agreement ¶ 4.)  (The term "brix" is a metric for sugar content.)  The Agreement also allowed Nature's Pearl to terminate the contract upon determining that KB Farms "failed to supply whole grapes of suitable quality."  (Agreement ¶ 11.)

7.      The 2012 and 2013 harvests passed without incident.  (*See* Compl. ¶ 26; Answer ¶ 26.)  Not so for the 2014 harvest.  Nature's Pearl alleges that KB Farms delivered a load of fermented, unusable grapes in September 2014.  (*See* Countercl. ¶¶ 13–14.)  KB Farms denies the allegation, calling it a pretext for Defendants' later efforts to renegotiate the terms of their bargain, and also claims that Nature's Pearl improperly refused to pay for the shipment.  (*See* Pl.'s Reply to Countercl. ¶¶ 10–11, ECF No. 7; *see generally* Compl. ¶¶ 32–52.)

8.     Some facts are undisputed.  KB Farms picked the grapes at issue on September 6 and shipped them on September 8.  (*See* Dep. K. Bodenhamer 116:3–8, ECF No. 74.5.)  Nature's Pearl inspected the grapes, did not reject them, and then pressed them into juice on the day of delivery.  (*See* Dep. A. Smith 41:6–8, 68:10–17, 71:9–10;[1] Aff. A. Smith ¶ 4, ECF No. 74.2.)  Just over a month later, Jerry Smith sent KB Farms a letter refusing to pay for the shipment on the ground that the grapes "were approximately 18 brix and tested 0.70 alcohol."  (Compl. Ex. B.)

9.     According to Nature's Pearl, the grapes were fermented at the time of delivery.  Achan Smith, Jerry's son and the supervisor in charge of processing grapes at Nature's Pearl, testified that the grapes' "general appearance and odor" upon delivery suggested that "something was amiss."  (Aff. A. Smith. ¶¶ 1, 5.)  The grapes "had a different smell than all the rest," an "alcohol smell."  (Dep. A. Smith 40:3–6; *see also* Dep. A. Smith 64:14–18, 85:14–22.)  Achan Smith further testified that Kerry Bodenhamer admitted the shipment contained grapes that "seem[ed] to ripen quicker than the others."  (Dep. A Smith 39:6–11; *see also* Dep. D. Bodenhamer 62:15–25, ECF No. 74.8.)

10.     Nature's Pearl asserts that it was unable to confirm that the grapes were fermented until it pressed them and pasteurized the juice.  At that point, Achan Smith smelled "alcohol" again.  (Dep. A. Smith 64:14–18.)  He states that he tried to salvage the juice by blending it with "good" juice from a different shipment but was unable to reduce the alcohol content below the legal threshold for non-alcoholic

---

[1] Excerpts of Achan Smith's deposition testimony appear in exhibits located at ECF Nos. 69.1, 74.11, and 76.7.

beverages. (Dep. A. Smith 64:11–68:3; *see also* Aff. S. Mitchell ¶ 2, ECF No. 74.4; Aff. R. Fouts ¶ 3, ECF No. 74.3.)

11. KB Farms sees things differently. It points to evidence that the grapes were not fermented at the time of delivery. Kerry Bodenhamer recalls, for example, that Achan Smith characterized the grapes as "rough" but said nothing about fermentation or an alcohol smell. (Dep. K. Bodenhamer 140:15–19.) KB Farms also insists that the time for inspection and rejection under the Agreement was upon delivery, not after the grapes were processed. When Bodenhamer asked whether Nature's Pearl would reject the shipment, the answer from Achan Smith was no. (*See* Dep. A. Smith 68:10–17, 71:9–10; Dep. D. Bodenhamer 62:4–7.) According to KB Farms, Nature's Pearl was not free to change its mind, particularly after processing the grapes and blending their juice with juice from another shipment (which, it suggests, came from another vineyard). (*See* Dep. K. Bodenhamer 139:10–140:4; Br. in Supp. of Pl.'s Mot. Summary J. 4 ["Pl.'s Br. in Supp."], ECF No. 68.)

12. Nearly a year of uncertainty ensued. Nature's Pearl threatened to terminate the Agreement, prompting unsuccessful negotiations to amend its terms. (*See* Compl. Exs. C–P.) By June 2015, the parties' relationship reached the breaking point. Jerry Smith gave written notice of termination "for [KB Farms'] failure to provide suitable grapes for processing." (Compl. Ex. H.) KB Farms refused to recognize the termination, stating its intent to deliver the 2015 harvest, which Nature's Pearl turned away. (*See* Compl. ¶ 48, Ex. N.) In October 2015, Smith sent KB Farms "a check for the bad grapes" from the bank account of Le Bleu Corporation,

another company owned by Smith. (Compl. Ex. M.) KB Farms rejected the check. (Compl. Ex. O; Dep. J. Smith 105:8–12.[2])

13. KB Farms filed this action in May 2016, asserting claims against Nature's Pearl for breach of contract, tortious breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair or deceptive trade practices. KB Farms also asserted those claims, along with an additional claim for tortious interference with contract, against Jerry Smith and Le Bleu. KB Farms alleged that Smith and Le Bleu should be liable for Nature's Pearl's debts in part because of their participation in the alleged breach, including Smith's use of Le Bleu to pay for grapes purchased by Nature's Pearl. In response, Nature's Pearl filed counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of the implied warranties of merchantability and fitness for a particular purpose.

14. Defendants moved for judgment on the pleadings on some but not all of KB Farms' claims. The Court granted the motion in part, dismissing the claims for tortious breach, unfair trade practices, and tortious interference. *Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp*, 2017 NCBC LEXIS 27, at *27 (N.C. Super. Ct. March 27, 2017). The Court also concluded that Jerry Smith and Le Bleu were not parties to the Agreement and therefore could not have breached it or the implied covenant of good faith and fair dealing. The Court allowed the claims against Smith and Le Bleu to proceed to the extent they "rested on a theory of veil piercing," though

---

[2] Excerpts of Jerry Smith's deposition testimony appear in exhibits located at ECF Nos. 74.7, 76.6, and 79.2.

noting that, "[i]n the event discovery demonstrates that KB Farms' veil-piercing theory lacks substance, Smith and Le Bleu remain[ed] free to challenge it on summary judgment." *Id.* at *15.

15.    Discovery is now complete, and each side has moved for summary judgment. (ECF Nos. 67, 70.)  The motions have been fully briefed, and the Court held a hearing on May 24, 2018, at which all parties were represented by counsel.

II.
LEGAL STANDARD

16.    Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c).  In deciding a motion for summary judgment, the Court views the evidence "in the light most favorable to the nonmov[ant]," taking the non-movant's evidence as true and drawing inferences in its favor.  *Furr v. K-Mart Corp.*, 142 N.C. App. 325, 327, 543 S.E.2d 166, 168 (2001).

17.    The moving party "bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002).  If the moving party carries this burden, the responding party "may not rest upon the mere allegations or denials of his pleading," N.C. R. Civ. P. 56(e), but must instead "come forward with specific facts establishing the presence of a genuine factual dispute for trial," *Liberty Mut. Ins. Co.*, 356 N.C. at 579, 573 S.E.2d at 124.  A "genuine issue" exists when "'it is supported by substantial evidence,' which is that amount of relevant evidence necessary to persuade a

reasonable mind to accept a conclusion." *Id.* at 579, 573 S.E.2d at 124 (quoting *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002)) (internal citation omitted).

## III.
## DEFENDANTS' MOTION

18. Defendants' motion for summary judgment comes in two parts. Jerry Smith and Le Bleu seek summary judgment on all remaining claims against them. They argue that discovery has confirmed their earlier contentions: that there is no basis to pierce the corporate veil and hold them liable for Nature's Pearl's alleged breach of contract. (*See* Br. in Supp. of Defs.' Mot. for Summary J. 6–8 ["Defs.' Op. Br."], ECF No. 71.) Nature's Pearl, by contrast, seeks only partial summary judgment, arguing that the law does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing. (*See* Defs.' Op. Br. 4–6.) The Court begins with Smith and Le Bleu.

### A. Piercing the Corporate Veil

19. As the Court explained in its previous Order and Opinion, "[d]isregarding the corporate form is not to be done lightly." *Green v. Freeman*, 367 N.C. 136, 145, 749 S.E.2d 262, 270 (2013). It is a "drastic remedy," reserved only for "an extreme case where necessary to serve the ends of justice." *Dorton v. Dorton*, 77 N.C. App. 667, 672, 336 S.E.2d 415, 419 (1985).

20. The test for piercing the corporate veil is often referred to as the instrumentality rule. That is, a person or entity "exercis[ing] actual control over another, operating the latter as a mere instrumentality or tool, is liable for the torts

of the corporation thus controlled." *Glenn v. Wagner*, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985). The plaintiff must show "domination and control of the corporate entity," "the use of that domination and control to perpetrate a fraud or wrong," and "the proximate causation of the wrong complained of by the domination and control." *Atl. Tobacco Co. v. Honeycutt*, 101 N.C. App. 160, 164, 398 S.E.2d 641, 643 (1990).

21. The second element is dispositive here. Even assuming KB Farms has provided sufficient evidence that Smith or Le Bleu controlled Nature's Pearl, it has neither alleged nor shown the use of that control to perpetrate a fraud or wrong. KB Farms' only theory is that Smith and Le Bleu "interjected themselves into the contractual relationship between Nature's Pearl and KB Farms" and "depriv[ed] KB Farms of the benefits of the Agreement for which it bargained." (Br. in Opp'n to Defs.' Mot. for Summary J. 11–12 ["Pl.'s Opp'n"], ECF No. 75.) This is not enough.

22. Our Court of Appeals has rejected the argument that a breach of contract, "in itself, can amount to a wrongdoing to meet the second element of the [instrumentality] test." *Best Cartage, Inc. v. Stonewall Packaging, LLC*, 219 N.C. App. 429, 440, 727 S.E.2d 291, 300 (2012). This rule derives from one of the essential differences between contract and tort actions: contracts are voluntary, consensual arrangements, and torts are not. The party seeking relief in a contract case has chosen its business partner (e.g., a subsidiary instead of a parent) and agreed to the terms of the arrangement (including allocating risk). If the party wishes to be able to hold a parent corporation or other controlling person liable for another entity's breach, it can negotiate for additional security as part of the deal, through a

guarantee, for example. When it forgoes these protections, the risk of loss may be greater, but that alone is not a sufficient reason to disturb the parties' bargain by permitting a greater recovery through equity than the contract itself permits. For these reasons, "courts usually apply more stringent standards to piercing the corporate veil in contract cases than they do in tort cases." 1 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 41.85; *see also, e.g., Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1577 (10th Cir. 1990).

23. Thus, our courts have pierced the veil in a case for breach of contract only where the evidence revealed other compelling factors apart from the breach itself. There must be some indicia of fraudulent or inequitable conduct: a showing, for example, that the puppet entity was created for the purpose of entering into the relevant contract or used as a means to unjustly insulate another from liability. *See Best Cartage*, 219 N.C. App. at 440, 727 S.E.2d at 300–01; *see also S. Shores Realty Servs. v. Miller*, 796 S.E.2d 340, 352–54 (N.C. Ct. App. 2017) (concluding plaintiff met second element where individual defendant created 30 or 40 LLCs to manage individual rental properties and intentionally "disregard[ed] the contractual obligation to return . . . rental deposits"); *E. Mkt. St. Square, Inc. v. Tycorp Pizza IV, Inc.*, 175 N.C. App. 628, 637, 625 S.E.2d 191, 199 (2006) (concluding plaintiff met second element where individual defendant created a shell corporation to shield himself from liability under contract at issue); *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2018 NCBC LEXIS 56, at *5 (N.C. Super. Ct. June 5, 2018) (individual manager defendants caused LLC to cease operations and then

transferred cash and assets to themselves or other entities they controlled rather than pro rata to creditors as required by statute).

24. KB Farms cites no contrary, controlling precedent. (*See* Pl.'s Opp'n 10–11.) The only case it cites is a nonbinding decision by a federal district court, decided nearly twenty years before *Best Cartage*. *See Dassault Falcon Jet Corp. v. Oberflex, Inc.*, 909 F. Supp. 345, 350 (M.D.N.C. 1995). But even *Dassault* requires more than an ordinary breach of contract. The alleged conduct must "show an ulterior purpose to benefit the person in control in a way *not possible or legal without misuse of the controlled corporation.*" *Id.* (emphasis added). That standard was met in *Dassault* in part because, after the dispute between the plaintiff and the defendant arose, the plaintiff sold all its puppet's assets, leaving only a shell corporation. *See id.* at 351.

25. There are no similar allegations or evidence here. KB Farms has neither alleged nor shown that Nature's Pearl was created for the purpose of entering into the Agreement. To the contrary, the complaint acknowledges that Nature's Pearl and Le Bleu are both bona fide, ongoing businesses with substantial operations and products. (*See* Compl. ¶ 7.) KB Farms argues that Le Bleu had an informal arrangement to purchase Nature's Pearl's grapes at cost, thereby depriving Nature's Pearl of profits, but the evidence it points to shows that profits increased from 2011 to 2016. (*See* Dep. J. Smith 170:13–15.) The evidence, even viewed in a light favorable to KB Farms, does not show that Smith or Le Bleu authorized fraudulent transactions to deplete Nature's Pearl's assets. Absent some indicia of fraudulent or inequitable conduct, the mere allegation of a breach of contract is not a basis to

disturb the allocation of risk negotiated by the parties by disregarding the corporate form. Summary judgment is appropriate.

26. In its opposition brief, KB Farms insists that Le Bleu should be liable for any breach on two theories unrelated to veil piercing (that Le Bleu assumed Nature's Pearl's contractual obligations or that Le Blue is a third-party beneficiary). (*See* Pl.'s Opp'n 13–14.) Neither is properly before the Court. In its previous Order & Opinion, the Court permitted the claims against Le Bleu to proceed only "to the extent" they "rest on a theory of veil piercing." *Kerry Bodenhamer Farms*, 2017 NCBC LEXIS 27, at *15. Furthermore, as Defendants correctly observe, KB Farms did not plead these theories in its complaint, and a motion for summary judgment is not an appropriate vehicle to introduce them.

27. For these reasons, the Court grants Defendants' motion for summary judgment as to the claims asserted against Jerry Smith and Le Bleu for breach of contract and breach of the implied covenant of good faith and fair dealing. No claims against Smith and Le Bleu remain, and they are dismissed from this action.

### B. Implied Covenant of Good Faith and Fair Dealing

28. Nature's Pearl moves for summary judgment only as to the claim for breach of the implied covenant of good faith and fair dealing. The argument is a narrow, legal one: Nature's Pearl contends that there is no independent cause of action for breach of the implied covenant.

29. This dispute is not over whether the Agreement between KB Farms and Nature's Pearl carries an implied covenant of good faith and fair dealing. It clearly

does. The Agreement is a "transaction[] in goods" subject to Article 2 of the Uniform Commercial Code ("UCC"). N.C. Gen. Stat. § 25-2-102; *see also id.* § 25-2-105(1) (definition of "Goods" includes "growing crops"). And "[e]very contract" governed by Article 2 "imposes an obligation of good faith in its performance and enforcement." *Id.* § 25-1-304; *see also Westpoint Stevens, Inc. v. Panda-Rosemary Corp.*, 1999 NCBC LEXIS 11, at *27 (N.C. Super. Ct. Dec. 16, 1999).

30.    The question is whether section 25-1-304, by imposing a duty to act in good faith, also gives rise to an independent cause of action for its breach. Although North Carolina courts have not addressed this question, courts in many other States, interpreting identical UCC provisions, have done so. "[T]he vast majority of courts having considered the issue conclude that breach of the obligation of good faith imposed by force of the U.C.C. does not give rise to an independent cause of action." *Doyle v. Fleetwood Homes of Va., Inc.*, 650 F. Supp. 2d 535, 540 (S.D. W. Va. 2009) (collecting cases; applying West Virginia's UCC).

31.    The reasons are twofold. First, the UCC's Official Comment expressly states that the obligation of good faith "does not support an independent cause of action of failure to perform or enforce in good faith." N.C. Gen. Stat. § 25-1-304 cmt. 1. Rather, "a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial right or power." *Id.* This language is clear and direct: a breach of the implied covenant does not give rise to a separate cause of action under the UCC, but it may support an action for breach of contract. *See, e.g., Pain*

*Center of SE Ind. LLC v. Origin Healthcare Solutions LLC*, 893 F.3d 454, 462 (7th Cir. 2018) (applying Indiana's UCC); *Smith v. JPMorgan Chase Bank, N.A.*, 2017 U.S. App. LEXIS 21101, at *2–3 (5th Cir. Oct. 25, 2017) (applying Texas's UCC); *Doyle*, 650 F. Supp. 2d at 539.

32.    Second, the UCC's "covenant of good faith and fair dealing is not an independent source of duties for the parties to a contract." *Baxter Healthcare Corp. v. O.R. Concepts, Inc.*, 69 F.3d 785, 792 (7th Cir. 1995) (applying Illinois's UCC).  The "obligation to perform or enforce in good faith extends only to the rights and duties resulting from" the contract itself.  *Doyle*, 650 F. Supp. 2d at 541 (citation omitted).  Put another way, the covenant of good faith "is not an undertaking that can be breached apart from those terms." *Autry Petroleum Co. v. BP Prods. N. Am., Inc.*, 2009 U.S. App. LEXIS 13978, at *6 (11th Cir. June 6, 2009) (applying Georgia's UCC).

33.    The Court sees no reason to depart from this widely accepted rule.  In construing other UCC provisions, our appellate courts have held that the statutory text "should be read in conjunction with the Official Comments." *S. Utils., Inc. v. Jerry Mandel Mach. Corp.*, 71 N.C. App. 188, 190, 321 S.E.2d 508, 509 (1984).  They "are by far the most useful aids to interpretation and construction," *id.* at 190, 321 S.E.2d at 510, and deserve "substantial weight." *Rentenbach Constructors, Inc. v. CM P'ship*, 181 N.C. App. 268, 271, 639 S.E.2d 16, 18–19 (2007) (quoting *Parsons v. Jefferson-Pilot Corp.*, 333 N.C. 420, 425, 426 S.E.2d 685, 689 (1993)).  Furthermore, the General Assembly directed our courts to construe the code with an eye toward

"mak[ing] uniform the law among the various jurisdictions." N.C. Gen. Stat. 25-1-103(a)(3).

34. Accordingly, the Court holds that section 25-1-304 does not create an independent cause of action for breach of the implied covenant of good faith and fair dealing. Nature's Pearl is entitled to summary judgment. It bears noting that the claim for breach of contract, which Nature's Pearl has not challenged, will proceed to trial. KB Farms may rely on the obligation of good faith imposed by the UCC in seeking to prove its claim for breach of contract at trial.

## IV.
## PLAINTIFF'S MOTION

35. All of Nature's Pearl's counterclaims rest on the essential allegation that the grapes delivered by KB Farms on September 8, 2014 were fermented. (*See* Countercl. ¶ 18; *see also* Countercl. ¶¶ 17–19, 26–30, 33–35.) These grapes, Nature's Pearl contends, did not conform to the Agreement. (*See* Agreement ¶¶ 4, 5.) It further alleges that fermented grapes are not suitable for juice and nutraceutical products, thereby breaching the implied warranties of merchantability and fitness for a particular purpose. (*See* Countercl. ¶¶ 27–28, 34.)

36. KB Farms argues that the undisputed facts require summary judgment. It contends that the express terms of the Agreement provide the exclusive means for Nature's Pearl to accept or reject whole grapes, thereby disclaiming the right to revoke acceptance and any implied warranties. The evidence, it contends, shows that Nature's Pearl accepted the grapes, processed them, and blended their juice with juice from another shipment. (*See* Pl.'s Br. in Supp. 2.) Because Nature's Pearl inspected

and accepted the grapes, KB Farms argues, it is beside the point whether they were fermented at the time of delivery. (*See* Pl.'s Br. in Supp. 3, 6.)

37.    This dispute raises two issues. The first is whether Nature's Pearl was entitled to revoke its acceptance of the grapes under the UCC. The second is whether the parties' Agreement disclaims the implied warranties of merchantability and fitness for a particular purpose.

A.    Revocation of Acceptance

38.    In any transaction for goods, the expectation is that the seller will deliver, and the buyer will accept, goods that conform to the contract. It doesn't always work out that way. Under the UCC, the onus is on the buyer to make an initial inspection. *See* N.C. Gen. Stat. § 25-2-606. If the goods conform to the contract, the buyer is obliged to accept and pay for them. *See id.* § 25-2-301. If the goods fail to conform, the buyer may choose to accept or reject them (or accept part and reject the rest). *See id.* § 25-2-601. That choice—acceptance or rejection—triggers other rights and duties for both buyer and seller. *See, e.g.*, *id.* §§ 603, 604.

39.    Acceptance is not necessarily final. "The buyer may revoke his acceptance" in limited circumstances, including where acceptance was made "without discovery of [the] nonconformity" and also "reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." *Id.* § 25-2-608(1)(b); *accord Roy Burt Enters., Inc. v. Marsh*, 328 N.C. 262, 264, 400 S.E.2d 425, 427 (1990). Revocation "must occur within a reasonable time after the buyer discovers or should

have discovered the ground for it and before any substantial change in the condition of the goods which is not caused by their own defects." N.C. Gen. Stat. § 25-2-608(2).

40. It is undisputed that Nature's Pearl accepted the grapes delivered by KB Farms on September 8, 2014. (*See* Dep. A. Smith 71:14–16; Dep. J. Smith 104:21–105:1; Defs.' Br. in Opp'n to Pl.'s Mot. for Summary J. 13 ["Defs.' Opp'n"], ECF No. 74; Pl.'s Reply Br. in Supp. of Mot. for Summary J. 1 ["Pl.'s Reply Br."], ECF No. 78.) Nature's Pearl contends that it timely and properly revoked its acceptance after testing the grapes' fermentation level. (*See* Defs.' Opp'n 13.) KB Farms, by contrast, contends that Nature's Pearl's refusal to pay for the grapes was an untimely rejection.

41. The threshold question is whether Nature's Pearl bargained away its revocation rights. With few exceptions, the UCC permits parties the freedom to vary its provisions "by agreement." N.C. Gen. Stat. § 25-1-302(a). This includes the provisions governing acceptance, rejection, and revocation. *See, e.g.*, *Business Commc'ns, Inc. v. Ki Networks, Inc.*, 157 N.C. App. 710, 712–13, 580 S.E.2d 77, 78–79 (2003).

42. KB Farms points to paragraph 4 of the Agreement, which states, in part, that Nature's Pearl "shall make the sole determination as to the quality of the product at the time of processing the whole grapes" and "shall have the right to reject any whole grapes" that it determines to be unusable. (Agreement ¶ 4.) KB Farms interprets this language—particularly the repeated references to "whole grapes"—to eliminate Nature's Pearl's "right to revoke acceptance" after processing the grapes. (Pl.'s Reply Br. 3–4.) KB Farms also contends that allowing Nature's Pearl to revoke

acceptance after delivery would render superfluous the need for it to reject fermented grapes upon delivery. (*See* Pl.'s Reply Br. 3–5.)

43. The Court disagrees. To the extent paragraph 4 modifies the UCC's default rules, it does so only with respect to the rules for *rejecting* grapes. Absent from paragraph 4 is any reference to the rules for *revoking* acceptance once given. It would not be reasonable to construe the parties' silence to demonstrate a shared intent to eliminate the right of revocation altogether.

44. Nor does the existence of a right to revoke create an inconsistency or render superfluous paragraph 4. The premise of KB Farms' argument is that it was feasible to test grapes for fermentation at the time of delivery (a fact Nature's Pearl vigorously contests) and that the Agreement required Nature's Pearl to do so. (*See* Pl.'s Reply Br. 5 & n.3.) Assuming KB Farms is correct, though, section 25-2-608 would never come into play. The statute permits revocation only when a buyer accepts goods before learning of the defect because the defect is too difficult to discover. *See* N.C. Gen. Stat. § 25-2-608(2). If Nature's Pearl could have discovered fermentation by inspecting the grapes before acceptance, then it was required to reject them at that time, and could not revoke its acceptance later, under both the statute and the Agreement. The right to revoke becomes operative only if Nature's Pearl could not have reasonably discovered the fermentation until after acceptance. In that circumstance, the right to revoke supplements but does not displace or render superfluous the right to reject.

45. In short, paragraph 4 is fully consistent with the existence of a right to revoke under section 25-2-608. KB Farms' argument that Nature's Pearl should have tested the grapes for fermentation upon delivery has no bearing on the proper interpretation of the Agreement but is instead more aptly characterized as a factual dispute about whether Nature's Pearl can satisfy the preconditions for revocation. That dispute is one for the jury.

46. The parties also have factual disputes about section 25-2-608's other requirements. One requirement is that revocation must occur "before any substantial change in condition of the goods which is not caused by their own defects." N.C. Gen. Stat. § 25-2-608. The purpose of this section "is for the protection of sellers where the buyer allows the goods to deteriorate, creating the risk that the alleged defect was caused or aggravated by the buyer's action or inaction." *Roy Burt*, 328 N.C. at 264, 400 S.E.2d at 427.

47. KB Farms argues that Nature's Pearl cannot satisfy this requirement because it pressed the grapes, processed them, and bottled the juice before attempting to revoke its acceptance. (*See* Pl.'s Reply Br. 6–7.) It contends that these actions resulted in a substantial change in the grapes' condition as a matter of law, citing authority from other jurisdictions in support. (*See* Pl.'s Reply Br. 7.)

48. Our Supreme Court, however, has not construed section 25-2-608 in this fashion. In *Roy Burt*, a farmer claimed that fertilizer purchased from the defendant damaged his crops and land. The farmer attempted to revoke his acceptance long after spreading the fertilizer on his fields. Although the fertilizer was absorbed into

the soil and fully consumed, the Supreme Court held that there was a genuine issue of fact concerning whether these circumstances constituted a "substantial change in the condition of the fertilizer." *Roy Burt*, 328 N.C. at 264, 400 S.E.2d at 427. The Court based this decision on evidence that the seller "contemplated that the buyer would use the fertilizer," that the defect "could not be discovered without difficulty except by spreading the fertilizer," and that spreading the fertilizer did not cause or aggravate the defect. *Id.* at 264–65, 400 S.E.2d at 427–28.

49. Here, Nature's Pearl has forecast evidence showing that the grapes were riper grapes smelling of alcohol; that KB Farms shipped them two days after harvesting; and that Nature's Pearl stopped the fermentation process shortly after delivery by pasteurizing the juice. (Dep. D. Bodenhamer 62:15–25; Aff. A. Smith ¶ 5; Dep. R. Ghaedian 191:9–13, ECF No. 74.9.) Nature's Pearl has also forecast evidence, through its expert's testimony, that it could not have discovered the fermentation by inspecting the grapes upon delivery. (Dep. R. Ghaedian 167:3–5, 170:1–173:9; *see also* Dep. A. Smith 86:5–8.) Viewed in the light most favorable to Nature's Pearl, the evidence tends to show that KB Farms knew Nature's Pearl would use the grapes to make juice, that the grapes were fermented at the time of delivery, and that Nature's Pearl's conduct did not cause or aggravate the fermentation, all of which is sufficient to establish a genuine issue of material fact under *Roy Burt*. *See also W.A. Davis Realty, Inc. v. Wakelon Agri-Products, Inc.*, 84 N.C. App. 97, 97, 351 S.E.2d 816, 818 (1987).

50. Section 2-25-608 also requires that the nonconformity "substantially impair[]" the goods' value to the buyer. KB Farms argues that Nature's Pearl cannot meet this element as a matter of law because it sold the juice to another merchant in California. (*See* Pl.'s Reply Br. 7–8; Dep. K. Bodenhamer 192:25–193:6.) Again, there are genuine factual disputes. Nature's Pearl points to evidence that the elevated alcohol content cost it a substantial amount of money. (*See* Dep. J. Smith 105:1–10, 106:1–12, 107:6–15; *see also* Aff. A. Smith ¶ 6.)

51. Finally, revocation is not effective until the buyer gives notice. *See* N.C. Gen. Stat. § 2-25-608(2). KB Farms argues that Nature's Pearl failed to give reasonable notice because its letter did not mention revocation. (*See* Pl.'s Reply Br. 8–9.) But "[f]ormal notice" is not required. *Roy Burt*, 328 N.C. at 264, 400 S.E.2d at 427. And reasonableness is typically a question for the jury. *See Warren v. Guttanit, Inc.*, 69 N.C. App. 103, 110, 317 S.E.2d 5, 11 (1984). Nature's Pearl provides evidence showing that it was dissatisfied with the product's alcohol content and that it stated its refusal to pay. This is sufficient, at a minimum, to reach the jury. *See Roy Burt*, 328 N.C. at 264, 400 S.E.2d at 427; *Warren*, 69 N.C. App. at 109–11, 317 S.E.2d at 10–11.

52. Implicit in all of KB Farms' arguments is a concern that it is easy for buyers to gin up false or "stale" claims related to perishable agricultural products. (Pl.'s Reply Br. 4.) The concerns are fair. Spoilage and decay are not just expected, but inevitable. The right to revoke acceptance, though, is not "unfettered," as KB Farms contends. (Pl.'s Reply Br. 5.) Section 25-2-608 includes elements designed to prevent

revocation based on nothing more than a change of heart, and Nature's Pearl must convince a jury that it satisfied these preconditions.

53.    At this stage, the evidence forecast by Nature's Pearl is sufficient to create a jury question. The motion for summary judgment as to the counterclaim for breach of contract is denied.

## B. Implied Warranties

54.    Under the UCC, every contract for a transaction in goods carries implied warranties that the goods shall be merchantable and fit for the particular purpose for which the goods are required. *See* N.C. Gen. Stat. §§ 25-2-314, -315. Both warranties may be excluded or modified, but any disclaimer must be in writing and conspicuous. *Id.* § 25-2-315. These requirements are met when the contract states, for example, that the goods are provided "as is" and marked with bold, italics, or similar distinction. *See id.* § 25-2-316(3)(a); *see also Tyson v. Ciba-Geigy Corp.*, 82 N.C. App. 626, 631, 347 S.E.2d 473, 477 (1986); *Billings v. Joseph Harris Co.*, 27 N.C. App. 689, 693, 220 S.E.2d 361, 365 (1975).

55.    The Agreement does not include a disclaimer of implied warranties, much less the type of conspicuous disclaimer required by the UCC. Nature's Pearl did not agree to take KB Farms' grapes "as is" or "with all faults." N.C. Gen. Stat. § 25-2-316(3). To the contrary, it agreed to purchase only grapes of "good quality." (Agreement ¶ 4.)

56.    KB Farms insists that its "grapes were not subject to any implied warranty" because the terms of the Agreement "are wholly inconsistent with the implied

warranties." (Pl.'s Br. in Supp. 6.) Even if that were true, inconsistency alone is insufficient to disclaim implied warranties under section 25-2-316. The disclaimer must be conspicuous. Here, even KB Farms concedes that the Agreement does "not explicitly disclaim[] implied warranties." (Pl.'s Br. in Supp. 6.)

57. KB Farms also argues that Nature's Pearl cannot prove a breach of any implied warranty as a matter of law because it blended the purportedly bad batch of juice with juice from a different vendor before testing for alcohol content. (Pl.'s Reply Br. 10.) The evidence, though, is conflicting at best. As noted above, Nature's Pearl has provided some evidence tending to show that the grapes were fermented at the time of delivery. (*See, e.g.*, Dep. A. Smith 39:6–11, 40:3–6, ECF No. 74.11; *see also* Dep. A. Smith 64:14–18, 85:14–22; Aff. A. Smith. ¶¶ 1, 5; Dep. D. Bodenhamer 62:15–25.) Its witnesses have also testified that no grapes or juice from other vendors was present during the relevant timeframe. (*See* Dep. C. Smith 26:8–16, ECF No. 69.2; *see also* Dep. A. Smith 55:22, 77:17–19, 78:1–3; Aff. A. Smith ¶ 1.)

58. Viewing this evidence in a light most favorable to Nature's Pearl, the Court cannot conclude as a matter of law that KB Farms did not breach the implied warranties of merchantability and fitness for a particular purpose. The Court therefore denies the motion for summary judgment as to the counterclaims for breach of the implied warranties.

## C. Implied Covenant of Good Faith and Fair Dealing

59. Nature's Pearl also asserts a counterclaim for breach of the implied covenant of good faith and fair dealing. As discussed above, the UCC does not recognize an

independent cause of action for breach of the implied covenant. Nature's Pearl argued as much in its briefing and at the hearing. (*See* Defs.' Opp'n 10 n.2.) The Court therefore grants KB Farms' motion for summary judgment as to the claim for breach of the implied covenant.

V.
CONCLUSION

60. For these reasons, the Court **ORDERS** as follows:

   a. KB Farms' motion for summary judgment is **GRANTED** in part. Nature's Pearl's counterclaim for breach of the implied covenant of good faith and fair dealing is **DISMISSED** with prejudice. Except as stated, KB Farms' motion is **DENIED**.

   b. Defendants' motion for partial summary judgment is **GRANTED**. The claims for breach of contract against Jerry Smith and Le Bleu are **DISMISSED**, and the claims for breach of the implied covenant of good faith and fair dealing against Nature's Pearl, Jerry Smith, and Le Bleu are **DISMISSED**, each with prejudice.

   c. KB Farms' claim for breach of contract against Nature's Pearl shall proceed to trial.

   d. Nature's Pearl's counterclaims for breach of contract, breach of the implied warranty of fitness for a particular purpose, and breach of the implied warranty of merchantability against KB Farms shall proceed to trial.

This the 15th day of August, 2018.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
for Complex Business Cases